UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LISTER-PETTER AMERICAS | ) | Case No. 15-10502-REN |
| INCORPORATED, | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| J. MICHAEL MORRIS, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No. 17-5030-REN |
| | ) | |
| GORDIAN TRADING LIMITED UK; | ) | |
| TREVOR R. MODELL; | ) | |
| AND DEVON M. MODELL, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT GORDIAN TRADING LIMITED UK'S
MEMORANDUM OF LAW AND STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................... 1

JURISDICTION, VENUE, AND STATUTORY PREDICATES ................................... 2

NOTICE ............................................................................................................................ 3

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................... 3

    A. The Debtor's Secured Borrowings .................................................................. 3

    B. The Various Entities ........................................................................................ 5

    C. The Intellectual Property Rights ................................................................... 11

    D. Proceedings to Vacate the Stay .................................................................... 13

LEGAL STANDARD ....................................................................................................... 20

ARGUMENT AND AUTHORITIES ............................................................................... 20

    I.    GORDIAN IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF
         THE TRUSTEE'S CLAIMS AGAINST IT. ............................................... 20

    A. Gordian's Secured Lien Should Not Be Subordinated (Count I) ............... 20

        1. The Gordian Played No Part In The Dorset Road Transaction. ............ 23

        2. The Trustee Has Not Proved Any Inequitable Conduct. ..................... 24

    B. Gordian's Claim Cannot Be Equitably Subordinated Based Upon The Conduct Of
       ESL Because Gordian Is Not An Assignee Of ESL For All Purposes (Count II) ....... 26

    C. The Trustee Is Not Entitled To Turnover From Gordian And Gordian Did Not
       Breach Any Fiduciary Duty to LPAI (Count III) ......................................... 28

        1. Turnover Is Improper Because Gordian Never Had Any Control Of The
          Dorset Road Assets. ............................................................................ 28

        2. Gordian's Purchase Of The CBT Loan Was Not A Breach Of Fiduciary To
          LPAI. ................................................................................................... 29

        3. The LP IP Should Not Be Equitably Subordinated. ........................... 31

    D. The Trustee Is Not Entitled To Marshalling And The Court Should Determine
       The Value Of Gordian's Claim (Count IV) ................................................. 32

        1. The Court Should Determine The Value Of Gordian's Claim Under The
          CBT Loan. ............................................................................................ 32

        2. The Trustee Is Not Entitled To Marshalling Or Disallowance Of Claim ......... 33

    E. The Trustee's Claim For Avoidance Of Fraudulent Obligation Makes No
       Allegations Against Gordian (Count V). ...................................................... 35

    F. The Trustee Is Not Entitled To An Additional Assessment Of Costs (Count VI) ...... 36

    II.   SANCTIONS SHOULD BE AWARDED AGAINST THE TRUSTEE AND
         TRUSTEE'S COUNSEL PURSUANT TO 28 U.S.C. § 1927. .............. 36

CONCLUSION ................................................................................................................ 39

Case 17-05030    Doc# 45    Filed 03/20/18    Page 2 of 44

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*In re 80 Nassau Assocs.,*
    169 B.R. 832 (Bankr.S.D.N.Y.1994) ..................................................................21

*All W. Pet Supply Co. v. Hill's Pet Prod. Div., Colgate-Palmolive Co.,*
    840 F. Supp. 1426 (D. Kan. 1993) ..................................................................20

*In re Alternate Fuels, Inc.,*
    789 F.3d 1139 (10th Cir. 2015)..................................................................24, 25

*In re American Remanufacturers, Inc.,*
    453 B.R. 235 (Bankr. D. Del. 2011) ..................................................................38

*Baulch v. Johns,*
    70 F.3d 813 (5th Cir. 1995) ..................................................................37

*Bixler v. Foster,*
    403 F. App'x 325 (10th Cir. 2010) ..................................................................37, 38

*In re Blagg,*
    372 B.R. 502 (Bankr. D. Kan. 2007)..................................................................33

*In re Blagg,*
    372 B.R. (Bankr. D. Kan. 2007) ..................................................................34

*In re Bob Grissett Golf Shoppes, Inc.,*
    50 B.R. 598 ..................................................................36

*In re Castletons, Inc.,*
    990 F.2d 551 (10th Cir. 1993) ..................................................................21, 26

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..................................................................20

*Dreiling v. Peugeot Motors of Am., Inc.,*
    768 F.2d 1159 (10th Cir. 1985)..................................................................36, 37, 38

*In re Eufaula Indus. Auth.,*
    266 B.R...................................................................23

*In re Eufaula Indus. Auth.,*
    266 B.R. 483 (B.A.P. 10th Cir. 2001) ..................................................................20, 21, 222

*In re Expert S. Tulsa, LLC,*
    534 B.R. 400 (B.A.P. 10th Cir. 2015), *aff'd*, 842 F.3d 1293 (10th Cir. 2016) ......................36

iii

*Fish v. Kobach*,
    320 F.R.D. 566 (D. Kan.) .........................................................................................37

*Flight Concepts Ltd. P'ship v. Boeing Co.*,
    819 F. Supp. 1535 (D. Kan. 1993), *aff'd*, 38 F.3d 1152 (10th Cir. 1994) ..............29

*Gillespie v. Seymour*,
    19 Kan. App. 2d 754 (1994) .....................................................................................28

*Girard v. Trade Professionals, Inc.*,
    13 F. App'x 865 (10th Cir. 2001) ....................................................................... 23, 24

*In re Graves*,
    609 F.3d 1153 (10th Cir. 2010)............................................................................ 33, 35

*Guar. Nat. Ins. Co. v. McGuire*,
    192 F. Supp. 2d 1204 (D. Kan. 2002) .....................................................................27

*In re Hedged-Investments Assocs., Inc.*,
    380 F.3d 1292 (10th Cir. 2004)..................................................................... 21, 24, 25

*In re Hedged-Investments Assocs., Inc.*,
    380 F.3d at 1301–02 ........................................................................................... 21, 24

*In re Henderson*,
    No. 05-42351, 2007 WL 4410222 (Bankr. D. Kan. Dec. 14, 2007), *aff'd sub nom. In re
    Sherlock*, No. 07-4145-JAR, 2008 WL 4277719 (D. Kan. Sept. 11, 2008)..........................34

*Herzfeld & Stern v. Blair*,
    769 F.2d 645 (10th Cir. 1985) .................................................................................37

*In re Lake Country Investments*,
    2001 WL 267475 (Bankr. D. Idaho 2001)......................................................... 30, 31

*In re Miller*,
    378 B.R. 418, 2007 WL 2332391 (B.A.P. 10th Cir. August 16, 2007) .............. 33, 34

*Olympia Co., Inc. v. Celotex Corp.*,
    771 F.2d 888 (5th Cir. 1985) ...................................................................................36

*OXY USA, Inc. v. Colorado Interstate Gas Co.*,
    20 Kan. App. 2d 69, 883 P.2d 1216 (1994) .............................................................37

*In re QuVis, Inc.*,
    446 B.R. 490 (Bankr. D. Kan. 2011), *aff'd sub nom.* ............................................22

*In re QuVIS, Inc.*,
    469 B.R. 353 (D. Kan.), *aff'd*, 504 F. App'x 747 (10th Cir. 2012)........................22

*Rajala v. Gardner*,
    No. 09-2482-EFM, 2012 WL 1189773 (D. Kan. Apr. 9, 2012), *aff'd,* 709 F.3d 1031 (10th
    Cir. 2013)..................................................................................................................31

*In re Repository Technologies, Inc.*,
    281 B.R. 852 (N.D. Ill. 2008) ........................................................................................25

*In re Robustelli*,
    430 B.R. 709 (N.D. Georgia 2010) ..............................................................................30

*In re Sun Spas by Schaeffer, Inc.*,
    122 B.R. 452 (Bankr. M.D. Fla. 1990)..........................................................................29

*In re Sunbelt Grain WKS, LLC*,
    427 B.R. 896 (D. Kan. 2010)................................................................... 21, 24, 26, 28

*In re Tankersley*,
    382 B.R. 522 (Bankr. D. Kan. 2008)..............................................................................22

*In re Taylor*,
    289 B.R. 379 (Bank. N.D. Ind. 2003) ...........................................................................35

*In re U.S. Medical, Inc.*,
    531 F.3d 1272 (10th Cir.2008) ......................................................................................23

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, and in accordance with D. Kan LBR 7056.1(a), Defendant Gordian Trading Limited UK ("Gordian"), by and through its counsel, submits this Memorandum of Law, and the statement of undisputed material facts contained herein, along with the Declaration of Vincent Filardo, Jr., Esq. executed on March 20, 2018, and the exhibits annexed hereto ("Filardo Decl."), in Support of Gordian's Motion for Summary Judgment ("Motion"). For the reasons stated herein, Gordian respectfully requests that its Motion be granted in its entirety.

## PRELIMINARY STATEMENT

The Trustee took no action against Gordian for over fourteen months in the underlying bankruptcy proceeding after his initial appointment. Then, just four days before the scheduled hearing on Gordian's motion to lift the automatic stay and for payment of its claim, the Trustee objected to Gordian's claim and filed the complaint in this adversary action.

Rather than attempt to prove his claims or putative defenses to Gordian's request to lift the stay and for payment of its claim, the Trustee instead testified at the Stay Trial his view as to why his newly filed action contained colorable claims, and requested more time to take discovery to prove those claims. Yet, in the year that this adversary proceeding has been pending, the Trustee has adduced or established no evidence in support of his claims and taken few, if any, steps to prove them. He has made no serious attempt to take discovery of defendants, and except for a single deposition of Citizens Bank and Trust Company (which was originally noticed by Gordian), has issued no third-party discovery. Gordian, however, has sought and taken documents and depositions from multiple third parties, including Scott Patton, the Trustee's professed main witness.

Despite the Trustee's testimony during the proceedings before this Court, the evidence obtained by Gordian from third parties has contradicted all of the Trustee's claims in this action.

1

Indeed, the record has revealed that: (i) Gordian was not part of the so-called LPAI-Dorset Road transaction, (ii) LPAI never tested and could not refute that the engine parts were defective, (iii) Gordian never owned LPAI, (iv) the charge over intellectual property identified by the Trustee was not a valid security for the CBT Loan, and (v) LPAI had no interest whatsoever in that intellectual property. Perhaps even more egregious, the Trustee's testimony before the Court as to what Scott Patton told him, and what he was prepared to testify about Gordian and the Dorsett Road transaction, was utterly false.

As the docket in the underlying bankruptcy case evidences, the Trustee has taken few if any steps to try to recover monies owed to the estate, and has filed no claims against any other party. The undisputed record in this action shows that the Trustee has not, and could never, prove his allegations and claims against Gordian. The inescapable conclusion is that Gordian is entitled to summary judgment on all of the claims alleged against it.

Moreover, despite Gordian's request that the Trustee withdraw all of his claims to which no evidence existed whatsoever, the Trustee refused even though it was clear that he could not satisfy his burden and prove his claims against Gordian. The Trustee's pursuit of legally bereft claims in lieu of a swift and amicable resolution of this case was unmistakably designed and intended to intimidate Gordian into a claim resolution absolutely unlikely to confer any benefit to it. Those crude efforts appear solely intended to benefit professionals retained by the Trustee, who together failed to efficiently administer the bankruptcy estate while holding Gordian's claim hostage. The Trustee, and his counsel, should be sanctioned for filing and pursuing this adversary proceeding against Gordian in bad faith.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter relates

2

to core proceeding *In re: Lister-Petter Americas Incorporated* ("LPAI" or "Debtor"), Case No. 15-10502, pending in the United States Bankruptcy Court for the District of Kansas ("*In re: Lister-Petter* Bankruptcy").

## NOTICE

2.      Notice of the Motion has been given to: (i) the Office of the United States Trustee; (ii) the Trustee and his counsel; (iii) Debtor's[1] counsel; and (iv) all parties who filed a Notice of Appearance in this case.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

3.      The above bankruptcy case was voluntarily commenced by the Debtor on March 17, 2015 ("Petition Date"), under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). *See* Ch. 11 Voluntary Petition [*In re Lister Petter* Dkt. Doc. 1]. By order dated June 26, 2015, J. Michael Morris was named as chapter 11 trustee. ("Trustee"). Doc. 15-10502, 191. By order dated December 14, 2015, the case was converted to chapter 7, and Morris continued as Trustee. Doc. 15-10502, 328.

### A.      The Debtor's Secured Borrowings

4.      Prior to the Petition date, and during the ordinary course of its business operations, LPAI borrowed certain sums pursuant to a Loan and Security Agreement dated July 31, 2008, as evidenced by various Promissory Notes made by LPAI and payable to Citizens Bank and Trust Company ("CBT") (together, as amended, restated, extended, renewed or otherwise modified from time to time, the "CBT Loan"). Filardo Decl. Ex.[2] A [July 31, 2008 Promissory Note and Loan and Security Agreement GTL000001-112]. Pursuant to section 6.2(a) of the CBT Loan Agreement, in the event of a default, LPAI promised to pay the principal balance

---

[1] Although both Lister- Petter Americas, Inc. ("LPAI") and Lister-Petter U.S. Holdings, Inc. ("LPUSH") are debtors in this court, LPAI is the debtor in the underlying bankruptcy case related to this adversary action brought by the Trustee. Complaint ("Compl.") ¶7.

[2] All references to exhibits herein are references to the Filardo Declaration Exhibits.

3

under the Promissory Notes plus a default rate of interest on the outstanding principal balance, among other penalties. *Id.* at §6.2(a) [GTL000029].

5.      It has never been alleged that the liens and claims created under the CBT Loan were not valid, perfected, or enforceable.

6.      LPAI and CBT are also parties to a certain Forbearance and Modification Agreements (collectively, and as amended, the "Forbearance Agreement"). Ex. B [March 11, 2014 Forbearance & Modification Agreement GTL000120-168].

7.      LPAI and CBT are also parties to a Term Loan Note executed on April 2, 2014 subject to the Forbearance Agreement (collectively, and as amended, the "Term Note"). Ex. C [Term Loan Note CB000142-43].

8.      The CBT Loan, Forbearance Agreement, and Term Note were guaranteed by Lister Petter Investment Holdings ("LPIH"), Lister Petter FZE ("LP FZE"), R.A. Lister Overseas Investments Limited ("RALOI"), Lister Petter Green Technologies Limited ("LP Green"), and Robert D'Aubigny (collectively, the "Guarantors") pursuant to a guaranty agreement (collectively, and as amended, the "Guaranty") in favor of CBT. Ex. D [Mar. 4, 2015 Bryan Cave Letter]; Ex. E [LPIH Limited Continuing Guaranty CB000840-48]; Ex. F [RALOI Continuing Guaranty CB000324-32]; Ex. G [Lister Petter FZE Limited Continuing Guaranty CB000145-153]; Ex. H [LP Green Continuing Guaranty CB000182-90]; Ex. I [Robert D'Aubigny Guaranty CB000932-38/Dippel Dep. Ex 10]. Trevor Modell also provided a Limited Guaranty for the benefit of CBT. Ex. J [CB000294-300].

9.      LP Green, an affiliate of LPAI, and CBT entered into a Charge Over Intellectual Property Agreement on or about April 2, 2014 (collectively, and as amended, the "Charge Over Agreement"). Ex. K [CB000191-212]. The Charge Over Agreement gave CBT a security interest in Lister Petter intellectual property ( "LP-IP" or "Charge Over IP") rights as additional collateral and security for obligations under for the CBT Loan, Forbearance Agreement, and Term Loan Note issued pursuant to the Forbearance Agreement. *Id.* at CB000193. LP Green,

as the purported owner of the LP-IP, provided the LP-IP as further security on behalf of LPAI because it was an affiliate and interested party of LPAI. *Id.* LPAI itself never had any rights in the LP-IP. Ex. L [Money Dep. Tr. at 29]. However, as discussed in more detail *infra*, LP Green had no security rights in the LP-IP that it could transfer to CBT. Ex. L at 25-29, 33-34.

**B.** **The Various Entities**

10. Gordian is a privately owned company. *See* Ex. M [Gordian Trading Ltd Certificate of Incorporation, pg. 4]; Ex. N [Feb. 28 Hearing Tr. at 39]. James Winder is the sole owner and shareholder of Gordian. Ex. M at 4; Ex. O [2013 Companies House Annual Return].

11. Trevor Modell and Devon Modell serve as Gordian directors, along with Mr. Winder. *See* Ex. P [2016 Companies House Annual Return]; Ex. N at 43. Trevor Modell was appointed as director on or about January 29, 2014, nearly two years after Gordian was formed. Ex. Q [Appointment of Director]; Ex. N at 43. Trevor Modell does not own any interest in Gordian. Ex. N at 44. In or about the end of 2014 and beginning of 2015, Gordian was considering purchasing LPAI through a purchase of RALOI shares. Ex. N at 50-53. RALOI was an asset of Lister Petter Investment Holdings Ltd. ("LPIH"), and RALOI in turn had an ownership interest in LPAI. Ex. N at 52-53.

12. Tyrone Courtmann in his capacity under United Kingdom law and as the appointed liquidator of LPIH ("LPIH Liquidator"), had the facility to sell Gordian 10,000 shares in RALOI ("RALOI Shares") that he believed LPIH had the right, title, and interest to for the total sum of £1.7 million, to be paid in multiple installments. *See* Ex. R at 21-22 [Courtmann Dep. 21-22]; Ex. N at 58; Ex. S [January 2015 Share Sale Agreement between LPIH Liquidator and Gordian]. The initial consideration was to be a non-refundable deposit, with monthly installment payments to follow. Ex. R at 21-22; Ex. S at §3.

5

13.     As part of the purchase, Gordian negotiated a three-month period to evaluate LPAI as a business venture.  Ex. N at 58-59; Ex. S at § 11.  Gordian made the first non-refundable installment payment so that it could begin its due diligence.  Ex N at 58.  Gordian was aware that if -- after the diligence period -- it decided not to make any further payments it would lose its initial payment. Ex N at 58; Ex. S at §3.

14.     The RALOI shares that the LPIH Liquidator was seeking to sell had been the subject of a prior agreement to transfer to a one-time Lister Petter affiliated Dubai company called Lister Petter FZE ("LP FZE").  Ex. R at 23-24; Ex T [Courtmann Liquidator Report].  However, it appeared to Courtmann that LP FZE had not performed under the agreement, and he could not ascertain whether LP FZE paid any consideration for the RALOI shares.  Ex. R at 23-24.

15.     Courtmann and LPIH requested that LP FZE return the shares to LPIH, and complete a stock transfer agreement and supplementary certificate required to perfect the return of the shares to LPIH.  *See* Ex. R at 24-25.  LPIH received the stock transfer agreement, but the supplementary certificate was never completed, and, as a result, the return of LP FZE's interest in the RALOI shares to LPIH was never perfected.  *See* Ex. R at 24-25.  All LPIH had, therefore, was, at best, an equitable, but not an absolute, interest in the RALOI shares. *See* Ex. R at 24-25; Ex. U [Email re: supplementary certificate Courtmann Dep. Ex. 8].

16.     Nevertheless, LPIH entered into the agreement to sell the RALOI shares to Gordian. Ex. R at 21-22.  The transfer of the RALOI shares to Gordian, however, was never recorded because transfer of those same shares back to LPIH was never perfected. Ex. R at 26-27; Ex.  U.

17.     Gordian's review of the Debtor's business and financial affairs revealed that it was indisputably insolvent. Ex. N at 61-65.  It had no unencumbered assets and no future means of income or potential sales, its stocked goods were outdated, it could not

afford to pay wages, and numerous creditors were seeking payment from the Debtor which had no apparent ability to pay those debts. Ex. N at 61-65. As a result, Gordian engaged Nazar to provide advice to LPAI relating to chapter 11 protections from its creditors and its possible reorganization. Ex. N at 68-71.

18. Trevor Modell and Devon Modell became directors of LPAI on March 17, 2015, on or immediately prior to the Petition date, because Nazar advised that a director needed to sign the Petition and there currently were none. Ex. N at 76; Ex V [Corporate Resolution/trustee's trial Ex. B]. Gordian, advanced LPAI's company expenses in 2015, including paying its employee wages. Ex. N at 69. Since LPAI had insufficient operating capital, Gordian further paid for the retainer of the Debtors' bankruptcy attorney, Nazar, as well as the fee to file the Chapter 11 bankruptcy petition. *See* Ex. N at 69; Ex. W [Mar. 1 Hearing Tr. at 43]. These costs totalled approximately £250,000 to £300,000. *See* Ex. N at 69.

19. Gordian realized that if LPAI were to continue in business, it needed to sell its remaining on-hand stock to generate income. Ex. N at 51-52; 65. In order to do so, Trevor Modell introduced LPAI to a potential customer, Dorset Road I Limited ("Dorset Road"), which needed engine parts for a deal it was negotiating with a third party, Idicom. Ex. N at 52, 65-67. Without LPAI's parts, Dorset Road would be unable to fulfil its contract with Idicom. Ex. N at 65-67. As part of that deal, Dorset Road was to pay LPAI approximately £1.5 million for specified engine parts. *Id.*

20. Gordian is not a shareholder nor does it own an interest in Dorset Road. Ex. X [Company's House Annual Report]. The sole shareholders of Dorset Road are Trevor Modell and EGL Engineering Ltd. *Id.* EGL is ultimately also owned by Trevor Modell. Ex. N at 45.

21. Dorset Road paid approximately £100,000 to ship the LPAI engine parts to the United Kingdom. Ex. N at 84. Upon arrival at Dorset Road, the goods were inspected and

7

found to be non-conforming and defective. *See* Ex. N at 84-90; Ex. Y [Dorset Road Engineering Inspection Report/Modell Decl. Ex. A]. The Trustee has never provided any evidence, expert or otherwise, to the contrary.

22.     Dorset Road refused to pay for the defective goods, and requested that LPAI pick up the engine parts -- at its own cost. Ex. N at 89-91; 154.

23.     As a consequence of the defective LPAI engine parts, Dorset Road was unable to perform under the Idicom contract, and was declared in breach. Ex. N at 91-92. As a result of the failed Idicom transaction, Dorset Road was placed in bankruptcy. Ex. N at 91-92.

24.     At the conclusion of its diligence period, Gordian decided that it would no longer make any further payments to LPIH because LPAI was not a functioning business worth purchasing. LPAI had no other contracts upon which it could rely to continue its business, no future business prospects, no future customer orders, and no remaining borrowing capacity from CBT. Ex. N at 92. As a result, the LPIH Liquidator never sought to perfect its interest in the RALOI Shares and properly record them, and the agreement between Gordian and the LPIH Liquidator was never fulfilled. Ex. R at 27-28. Gordian never received a certificate of the RALOI Shares that would entitle it to own the shares because the transfer from LP FZE to LPIH never lawfully occurred. Ex. R at 31-32, 36-39. In the end, Gordian paid a total of £155,000 to LPIH for no benefit to itself. Ex. R at 31-32.

25.     As a result of the foregoing, Gordian never became the owner of LPAI. As evidenced by UK public records, and as confirmed by Courtmann, RALOI is still owned by LP FZE. Ex. Z [RALOI Companies House 2014 Annual Return/ Courtmann Dep. Ex. 2]; Ex. R at 28-29.

26.     Prior to the petition date, LPAI was in default under the Forbearance Agreement. Ex AA [February 6, 2015 Letter from Bryan Cave]; Ex. D. CBT initially notified LPAI on February 6, 2015 that the Forbearance Period had expired due to a default under the

Forbearance Agreement. Ex AA. An additional default under the Forbearance Agreement occurred when LPAI failed to make a scheduled payment of $1,500,000 on or before February 25, 2015. Ex. D. As a result of the defaults, on March 4, 2015 CBT made a demand for payment for the full amount owed by LPAI. *Id.* LPAI's total obligation, calculated as of March 3, 2015 and which did not include the default rate, totalled $2,048,022.57. *Id.*

27.    After issuing its demand for payment, CBT abandoned its demand against LPAI and instead sold and assigned its rights to the CBT Loan to a third party, Embracing Solutions Limited ("ESL"). Ex. BB [March 6, 2015 Letter to Bryan Cave from Hinkle Law Firm N007312]. On or about March 3, 2015, CBT sold and assigned the CBT Loan Agreement, Guaranty and Forbearance Agreement along with all other related loan documents, including the security interest related to the Charge Over LP-IP (all components of the CBT Loan) to ESL pursuant to a Loan Sale Agreement and General Assignment, both dated March 3, 2015 ("ESL Purchase Agreement"). Ex. CC [General Assignment and Loan Agreement CBT000554-585]. The purchase price for the CBT Loan was $2,048,022.57. *Id.* at CBT000576. ESL paid part of the purchase price, $1,764,946.94, by wire transfer in immediately available funds. *Id.* at §2.2 [CBT000563]. ESL was to deliver a promissory note for the remainder of the purchase price. *Id.* at §3.1(a)[CBT000564]. LPAI's indebtedness and obligations under the CBT Loan were not paid down or otherwise released by the ESL Purchase Agreement and payment. Ex. DD [Dippel Dep. Tr. at 11, 51-52]; Ex. EE [Email chain between Dippel and Jaffe N009888-89 at N009889].

28.    The purchase was apparently a joint venture between D'Aubigny, ESL, and ESL's principal Anthony Jaffe. Ex. EE. D'Aubigny provided a guaranty for the benefit of CBT for the ESL Purchase Agreement. Ex. FF [March 3, 2015 Guaranty CB000375-381]. On or about March 9, 2015 ESL served notice on LP Green of ESL's intent to dispose of the Charge Over LP-IP rights because the CBT Loan had not been repaid by LPAI. Ex. GG [March 9, 2015 Emms Gilmore Liberson Letter LP000112-113]. ESL intended to foreclose on the loan as a way to take over LPAI. Ex. N at 68.

29.     On or about April 10, 2015, the Court entered an interim order authorizing, among other things, Debtor's use of cash collateral through the close of business on May 12, 2015, and granting adequate protection to CBT and ESL ("Cash Collateral and Adequate Protection Order"). Ex. HH. The order gave ESL a Super Priority Lien and Claim which, subject to Carve Out Costs, would "be an allowed claim against the Debtors with priority over any and all other administrative expenses and all other claims…." Ex. HH at ¶18.

30.     By this time, Gordian has already injected approximately £300,000 into LPAI, which otherwise had no funds to operate. Ex. N at 68-69. LPAI could not pay its monthly interest service on the CBT Loan, nor, of course, the principal balance due and owing to CBT. Ex. AA; Ex. D. Dorset Road was the only potential customer that LPAI had in the last six months of LPAI's operation. Ex II [Patton Dep. Tr. at 30-31]. No facts have been adduced by the Trustee to support any theory or assertion that LPAI could have satisfied or acquired the CBT Loan for itself at any relevant time prior to its sale and assignment to ESL, or thereafter.

31.     Subsequent to the Petition date, and on or about April 24, 2015, Gordian, ESL and Jaffe entered into a purchase and sale agreement whereby ESL assigned the CBT Loan, and all rights and claims arising thereunder, to Gordian.[3] Ex. JJ [April 24, 2015 Sale Agreement (Gordian Stay Trial Ex. 12)]. The unpaid amount of the CBT Loan purchased by Gordian from ESL was $2,048,022.57. Ex. CC; Ex. D; *see also* Ex. DD at 60:20-61:1 (CBT testifying that the unpaid obligation due under the CBT Loan, at the time of its sale to ESL, was "a few thousand dollars over two million[.]"). Gordian subsequently purchased all rights from ESL that it acquired pursuant to the CBT-LPAI Sale Agreement. Ex. JJ at §1. As part of the sale, Gordian released ESL from any obligations it owed to CBT. Ex. JJ at §6.

32.     Gordian had no other relationship with ESL except for the purchase of the CBT Loan from ESL, and has no connection to Anthony Jaffe or his wife Virginia Jaffe. Ex. KK [Trevor Modell Dep. Tr. 53-54].

---

[3] Trevor Modell and Devon Modell did not individually obtain any interest in the CBT Loan.

10

C.      The Intellectual Property Rights

33.     On or about January 6, 2014, Lister Petter Limited Incorporated ("LP Ltd.") and LP Green entered into an agreement for assignment of intellectual property rights and sale of tooling ("LP Green IP Sale Agreement").  Ex. LL [January 6, 2014 Assignment of Intellectual Property Right and Sale of Tooling/Money Dep. Ex. 3].  The LP Green IP Sale Agreement granted LP Green with an assignment for intellectual property rights in exchange for consideration of £554,090.  Ex. LL at §2.

34.     After he was appointed as LP Ltd. liquidator, Neil Money sought to sell assets owned by LP Ltd., including the LP Ltd. intellectual property ("LP-IP" or "IP Rights").  Ex. L at 18, 25.  Money reviewed the LP Green IP Sale Agreement and found it to be invalid because the payments required to complete the assignment were never made, the LP Green IP transaction was never completed, and that title for the IP rights accordingly never passed to LP Green.  Ex. L at 18-25.

35.     As liquidator of LP Ltd., Money determined he held and had the right to sell and assign the LP-IP.  Ex. L at 25-29, 33-34; *see also* Ex. DD at 25:17-22; 58:25-60:13 (CBT testifying that it was aware that a Lister-Petter UK entity was the owner of the LP-IP pledged as collateral backing the CBT Loan).

36.     On or about May 18, 2015, LP Ltd., Money as liquidator, and Gordian entered into an agreement for the Assignment of Intellectual Property Rights.  Ex. MM [May 18, 2015 Assignment of Intellectual Property Rights/Money Dep. Ex. 4]; Ex. L at 27-28.  Under the agreement, Gordian received "Assigned Rights" to the LP-IP. Ex. MM.

37.     LPAI never owned the LP-IP.  Ex. L at 29.

38.     LPAI never had any security rights in the LP-IP.  Ex. L at 29.

39.     LP Ltd. never received any licensing fees from LPAI on the LP-IP.  Ex. L at 29.

11

40. On or about May 21, 2015, due to the post-bankruptcy filing assignment of the CBT Loan from ESL to Gordian, the Court's interim order was extended through May 28, 2015. Ex. HH; Ex. NN [Doc. 15-10502, 147].

41. At a May 28, 2015 status hearing, Creditors' Committee counsel agreed to interpose and/or continue any objection to the Cash Collateral and Adequate Protection Order for 60 days, when it would submit with the Debtor an agreed final order for the Court's review and approval. Ex. OO [Exhibit A, May 28, 2015 Tr. at 4:3-5:6]. The Creditors' Committee, however, failed to interpose and/or continue any objection prior to the expiration of the 60-day period. Nor did it or the Trustee ever propose or submit a revised final Cash Collateral and Adequate Protection Order to the Court. Instead, the Trustee elected to stand by the terms of the Cash Collateral and Adequate Protection Order, and receive its benefits. The Creditors' Committee was disbanded in or about December 2015 when the administratively consolidated cases were converted from chapter 11 to chapter 7. Doc. 15-10502, 328.

42. On or about July 9, 2015 Gordian filed a Proof of Claim identifying the loan it acquired from CBT as a secured claim in the amount of $2,048,022.57 ("Claim"). Ex. PP [Proof of Claim].

43. Relying on the provisions and authority of the Cash Collateral and Adequate Protection Order, upon the expiration of the 60-day period and without objection to those provisions, on or about August 26, 2016, the Trustee moved to liquidate the tangible assets of the Debtors -- all of which comprise the Pre-Petition Collateral and Adequate Protection Collateral. Doc. 15-10502, 253; Doc. 15-10502, 254; Doc. 15-10502, 260.

44. On or about September 21, 2015, the Court granted the Trustee's motion, and ordered that the proceeds of the sale were subject to "the lien of Gordian Trading Limited, UK, asserted as assignee of Citizens Bank and Trust Company and Embracing Solutions Limited" -- namely the liens, claims and rights related to and arising in connection with the CBT Loan. Ex. QQ [Doc. 15-10502, 268]. The CBT Loan, while in the hands of the Bank and ESL, was never

12

challenged for its validity, perfection or enforceability, and has never thereafter been so challenged.

45.     The proceeds from the sale of the CBT Loan collateral, less the cost of sale and authorized estate expenses, comprise the entirety of the cash assets remaining in the Debtor's estate. *See* Trustee's October 9, 2015 Report of Sale [Doc. 15-10502, 285]; October 23, 2015 Report of Sale [Doc. 15-10502, 292]; and Trustee's January 7, 2016 Interim Report [Doc. 15-10502, 340]. The Docket reflects no litigation by the Trustee to recover any void or voidable transfers or any other assets subject to the lien, or otherwise.

**D.     Proceedings to Vacate the Stay**

46.     On August 19, 2016 Gordian moved for relief from the automatic stay for cause pursuant to 11 U.S.C. §362(D) to allow it to enforce its rights in the cash collateral securing its Bankruptcy Claim. Doc. 15-10502, 377; Doc. 15-10502, 378; Doc. 15-10502, 379. That motion was fully briefed as of September 19, 2016. [Doc. 15-10502, 381; Doc. 15-10502, 383.

47.     In connection with Gordian's motion, the Court ordered an evidentiary hearing to take place on February 28, 2017 ("Stay Trial"). Doc. 15-10502, 390.

48.     On February 24, 2017, almost exactly two years since the filing date of the Petition, and just four days before the Stay Trial was scheduled to commence, the Trustee filed objections to the Bankruptcy Claim. Doc. 15-10502, 419. On the same day, the Trustee filed the Complaint in this Adversary Action against Gordian, Trevor Modell and Devon Modell. Doc. 1.

49.     During the Stay Trial, held on February 28 and March 1, 2017, Gordian presented documentary evidence and testimony that demonstrated the amount of its claim under the CBT Loan in the amount of $2,048,022.57. *See* Ex. N; Ex. PP; Ex. CC; Ex. RR [Emails from Philip Brigs to William Dippel dated February 19, 2015 and bearing Defendant Gordian's Exhibit G009.]; Ex. D; Ex. SS [March 5, 2015 Letter from Nazar at Hinkle Law Firm to Bryan Cave]. Gordian also proved that the assets of the Debtor's estate were subject to unreasonable

dissipation such that the stay should be lifted. Ex. N at 192-212; 215-18. The amount of the claim was also later confirmed by a CBT representative, William Dippel, in an amount exceeding $2 million. Ex. DD at 60:20-61:1 (testifying that the value of the CBT Loan, at the time the note was sold to ESL, was "a few thousand dollars over two million[.]")..

50. At the Stay Trial, the Trustee called one witness with necessarily limited personal knowledge of only certain facts, Edward Nazar, counsel for the Debtors in the Chapter 11 cases. Ex. W at 4. Nazar testified that he prepared the LPAI bankruptcy petition for the Debtors, with help from Phillip Briggs, LPAI's general manager, who provided Nazar with most of the information for the chapter 11 filing. Ex. W at 32-33, 35-36. However, Briggs did not sign the petition itself. Ex. W at 36. Nazar stated that someone from his office placed Trevor Modell's electronic signature on the electronic petition. Ex. W at 33, 37; Ex. TT [Trustee Ex. E Bankruptcy Pet. Dated March 17, 2015]. Modell does not dispute that he authorized the petition, but was not consulted on the substance included in the petition or schedules, and left those details to the discretion and advice of Nazar. Ex. N at 76-77, 80.

51. Moreover, in the petition, Nazar listed the value owed to ESL from the CBT Loan as $304,000. Ex. UU [Trustee Ex. D, at Schedule D]. Nazar obtained that amount from LPAI, based on the presumption that it was the amount ESL initially paid for the CBT Loan. Ex. W at 38-39. Nazar never asked for Modell's input regarding the amounts listed in the schedules. Ex. N at 76-77, 80. Nazar could have amended the petition based on the actual amount of the debt owed on the CBT Loan -- which information was available to him as bankruptcy attorney -- but did not do so. Ex. W at 38-39; Ex. VV [CBT-ESL Loan Sale Agreement]. The information on the loan value calculation was available to him, and he had already responded to CBT's Demand for payment in the amount of $2,048,022.57. Ex. D; Ex SS; *see also* Ex. DD at 60:20-61:1 (CBT testifying that the value of the CBT Loan, at the time the note was sold to ESL, was "a few thousand dollars over two million[.]").

14

52.     During the Stay Trial, the Trustee testified that he spoke to Scott Patton, LPAI's shop foreman, on two or three occasions for over five hours about the LPAI engine parts that were to be sold to Dorset Road I Limited ("Dorset Road").  *See* Ex. N at 186; 226-27. Specifically, the Trustee testified that Patton told him the parts at issue in the Dorset Road transaction, discussed *infra*, were not defective, there was nothing wrong with them, and that Patton considered Dorset Road's assertion of nonconformity as a pretext for non-payment.  Ex. N at 186; 213; 224-25.

53.     The Trustee admitted that Patton had not provided him with any engineering reports that would substantiate these claims.  Ex. N at 186.

54.     The Trustee also testified that when he went to the facility to try to gain access to documents and information stored on LPAI's computers, Patton had no access to the passwords.  Ex. N at 219 ("There were a number of laptops when I went to the facility with no passwords available.  The only person available was Mr. Patton … He had no access to the passwords.").  Patton did have the password and a login to the LPAI company information system which the Trustee could have requested.  Ex. II at 44-45 ("Q: If he had asked you, would have you even – would you have had a log in or a password that you could have provided him? A: I would have still had my log in, yes.").

55.     During the Stay Trial, the Trustee made representations to the Court that there was "more than a colorable claim" against Gordian in the adversary action, and argued that the Court should not grant Gordian's motion for relief from the automatic stay until discovery was taken and his claims in the adversary action were decided by the Court.  Ex. N at 242-44; Ex. W at 75.  Despite the Trustee's assertions, upon which he knew the Court would rely, the Trustee has provided no evidence of any sort to support his claims against Gordian.

56.     At the close of the Stay Trial, the Court found that the cash collateral comprising the estate assets was subject to unreasonable dissipation.  Upon consent of the parties, the Court

ordered that the Trustee inquire into investing the assets in a way that would stop the payment of service fees that were dissipating the estate. Ex. W at 78-82.

57.    On March 3, 2017 the Trustee filed a report submitting two options to the Court for the cash collateral: (i) deposit them into the court registry or (ii) make an independent purchase of T-bills with the funds. Doc. 15-10502, 426.

58.    In its April 26, 2017 Order, the Court did not grant Gordian's motion for relief from stay. Doc. 15-10502, 435. The Court found that placing the proceeds of the Trustee's sales of LPAI's assets, subject to Gordian's lien claims, in federally-issued securities through the Court Registry Investment System, adequately protects the funds and collateral from unreasonable dissipation. *Id.* Moreover, based upon the Trustee's testimony and assertions, the Court did not lift the stay because there were questions of fact in connection with the claims in the adversary action, and Gordian was not entitled to relief until those claims were resolved. *Id.*

59.    The Trustee amended his Adversary Complaint on March 17, 2017. Doc. 4. Gordian filed its answer to the Trustee's adversary complaint on June 29, 2017. Doc. 13. Trevor and Devon Modell filed answers to the Trustee's adversary complaint on July 19, 2017. Doc. 16; Doc. 17; Doc. 18; Doc. 19.

60.    Contrary to his assertions during the Stay Trial concerning the necessity for additional discovery in support of his claims against Gordian, the Trustee has not sought or taken any new serious or relevant party discovery, nor has he produced any new relevant discovery in the twelve months since filing the Adversary Complaint in February 2017. The Trustee has not attempted to take the depositions of Gordian, Trevor or Devon Modell. He has not produced any new relevant documents to his claims that were not already produced prior to the Stay Trial.[4]   He has also not conducted any expert discovery to dispute the Dorset Road

---

[4] The Trustee did produce seven email chains, bates numbered LP000873-989, between him and Scott Patton relating to gaining access to the LPAI facility and coordinating shipment of goods for a sale not relevant to the claims against Gordian in this adversary proceeding.

engineering reports analyzing and determining the reasons why the LPAI engine parts are defective.  Ex. Y.

61.    The only document requests and interrogatories issued by the Trustee to the defendants in this adversary action were duplicative of the discovery already conducted in the bankruptcy case or not relevant to the adversary proceeding.  Ex. WW [November 29, 2017 Trustee's Requests]; Ex. XX [December 15, 2017 Gordian Discovery].  The Trustee has not sought documents from Phillip Briggs, Mike Shell, or Robert D'Aubigny.

62.    The Trustee did not seek the depositions of Gordian or the Modells in this adversary action, nor of former LPAI personnel Briggs, Shell and D'Aubigny.  The Trustee did not even seek the deposition of Scott Patton.

63.    The only deposition the Trustee took in the last twelve months was a third-party deposition of a CBT representative, William Dippel, which Gordian initially noticed in its subpoena to CBT.  Ex. YY [Gordian CBT subpoena].  All other depositions and discovery were taken at Gordian's initiative, including the deposition of Scott Patton.  Ex. ZZ [Patton subpoena]; Ex. AAA [Shell subpoena]; Ex. BBB [Courtman, Money subpoena].

64.    Notwithstanding the Trustee's inactivity, defendants took significant discovery in this case.  They issued relevant document requests and interrogatories to the Trustee.  Ex. CCC [November 8, 2017 Trustee's Responses to Gordian's First Interogs and RFP's].   Gordian issued subpoenas for documents and testimony to Patton, Shell, CBT, Neil Money, and Tyrone Courtmann.  *See* Ex.  YY; Ex. ZZ; Ex. AAA; Ex. BBB.  Gordian took the depositions of Patton, Money, Courtmann, and CBT.  As discussed herein, those depositions provided undisputed testimony that indisputably refutes the unsupported and unsupportable allegations in the Trustee's complaint.

65.    The Trustee has repeatedly stated under oath that Scott Patton, the former production manager at LPAI, was a material witness to his claims against Gordian and could provide key evidence regarding the substance of the Trustee's claims.  *See, e.g.* N at 186; 213.

17

However, contrary to the Trustee's Rule 26(a) initial disclosures that Patton "may testify" and has knowledge of LPAI's or its affiliates' transactions and dealings with Trevor Modell, and knowledge of Gordian's and its affiliates' transactions and dealings with Trevor Modell, Patton testified during his deposition that he has no such knowledge. Ex. II at 46-48; Ex DDD [Trustee's Rule 26(a)(1) Initial Disclosures]. There are no facts to support the Trustee's sworn assertion in the record of this case.

66.    During his deposition, Patton, who has no stake in these proceedings, directly contradicted the Trustee's Stay Trial testimony. Patton testified that he only met with the Trustee twice, briefly, for less than an hour each time. Ex. II at 22-26. When Patton did meet with the Trustee, it was only to give him access to the LPAI facility and assets within it. Ex. II at 26-27; 41-42. The only phone conversation Patton recalled having with the Trustee concerned employees obtaining certain paperwork. Ex. II at 27. Patton never talked to the Trustee about any issues concerning the quality of LPAI's products. Ex. II at 26. Patton testified that he had no information and thus would not be able to testify at trial about LPAI's transactions with Gordian, its affiliates, or Trevor Modell. Ex II at 46-48.

67.    Patton's discussions with the Trustee were not relevant to the claims here -- he denied having knowledge of the subject matter identified for him in the Trustee's Rule 26(a) Disclosures -- but only concerned access to the LPAI facilities and assisting the Trustee with shipping assets that the Trustee sold at auction (for which services Patton was paid by the Trustee). Ex. II at 26-27; 36-37; 41-42]. Most important, Patton never tested any of the LPAI engine parts shipped to Dorset Road that the Trustee claims were not defective, nor did Patton have the ability to test those parts, so he could not form an opinion or determine whether or not those parts were defective and worthless. Ex.II at 11-14; 26-27; 41-42.

68.    Patton testified that LPAI did not have any quality control in place, and no quality control department existed at LPAI for at least six months before LPAI closed. Ex. II at 11-12, 14. Patton said he did conduct some visual inspections, but only when customers

18

reported a concern. Ex. II at 13. Once the quality control department was eliminated, the equipment previously used to test parts was no longer used. Ex. II at 14. Patton testified that LPAI had a previous issue with parts on a different contract, and the contract was not renewed. Ex. II at 53-54. Patton also testified that his dealings with Dorset Road were limited to production scheduling conversations and inventory supply issues – the ability to supply or obtain parts -- with Paul Wilkes, the purchasing person at Dorset Road. Ex. II at 49-51.

69.     In contrast, the Trustee testified at the Stay Trial that he had extensive discussions with Patton concerning the conforming quality of the engine parts shipped from LPAI to Dorset Road, even recounting Patton's supposed opinion that the engineering report submitted by Dorset Road on the non-conforming quality of the shipment "was nothing but a pretext to not pay." Ex. N at 186.

70.     Patton testified that he was asked to come to the UK to ship the parts back to Kansas. Ex. II at 49-51. Patton also admitted that some of the products contained rust. Ex. II at 55. Patton also testified that he did not inspect all of the parts and components. Ex. II at 55. Patton testified that the parts were shipped back to the United States, and that he had no information on whether they were inspected when they were returned to the United States. Ex. II at 56-57; 64. Patton testified that although he would have been at the warehouse facility in Kansas that received the products, but he did not know who physically received them in the system. Ex. II at 62-63. Patton also reinforced that he did not have communications with the Trustee regarding the condition of the parts. Ex. II at 66.

71.     Moreover, The Trustee never requested that Patton provide access to LPAI's information systems, nor asked for his username or password. Ex. II at 44-45. Patton testified that his log-in and password enabled access to the Sage electronic document system that stored all of LPAI's computer-based documents and information, including purchasing and accounting documents. Ex. II at 32-33; 44-45.

72.     Patton was never contacted in preparation for this adversary action against Gordian.  Ex. II at 46-47.  Patton testified that he would not be able to provide testimony about LPAI and its transactions or dealings with Gordian or Trevor Modell.  Ex. II at 48.  He was not involved in any dealings between LPAI and any creditors.   Ex. II at 47.

73.     After the deposition of Patton, Gordian's counsel requested that the Trustee withdraw some or all of his claims, including with respect to the so-called charge-over intellectual property.  The Trustee's counsel, on his behalf, refused to withdraw any claims.  *See* Filardo Decl. at ¶ 2.

## LEGAL STANDARD

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To avoid summary judgment, "[t]he nonmoving party must go beyond the pleadings and designate specific facts, by affidavits, depositions, answers to interrogatories, and admissions on file, showing that there is a genuine issue for trial."  *All W. Pet Supply Co. v. Hill's Pet Prod. Div., Colgate-Palmolive Co.*, 840 F. Supp. 1426, 1428 (D. Kan. 1993).

## ARGUMENT AND AUTHORITIES

## I.     GORDIAN IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF THE TRUSTEE'S CLAIMS AGAINST IT.

### A.     Gordian's Secured Lien Should Not Be Subordinated (Count I)

Equitable subordination in bankruptcy is governed by § 510(c) of the Bankruptcy code, which permits "equitable subordination" of all or a portion of a creditor's claims "for purposes of distribution" or allows for a lien securing the subordinated claim to be transferred to the estate.  11 U.S.C.A. § 510(c) (West 2018).  Because equitable subordination is remedial, and not penal, it must be tailored and should be applied "'only to the extent necessary to offset the harm which... creditors suffered as a result of the inequitable conduct.'" *In re Eufaula Indus. Auth.*, 266

20

B.R. 483, 488 (B.A.P. 10th Cir. 2001); *see also In re 80 Nassau Assocs.,* 169 B.R. 832, 840

(Bankr.S.D.N.Y.1994) ("If the injury or unfair advantage affects only a specific creditor or

segment of creditors, the court should subordinate the offending claimant only to the more

limited class of claims rather than the claims of all creditors."). A party seeking equitable

subordination must demonstrate that 1) the claimant engaged in inequitable conduct; 2) the

conduct has injured creditors or given unfair advantage to the claimant; and 3) subordination is

not inconsistent with the Bankruptcy Code. *In re Castletons, Inc.,* 990 F.2d 551, 559 (10th Cir.

1993) (citations omitted). Out of the three factors, "'[t]he critical inquiry … is whether there has

been inequitable conduct on the part of the party whose debt is sought to be subordinated.'" *Id.*

(citations omitted).

For subordination purposes, "inequitable conduct" encompasses three categories:  "'(1)

fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the

debtor as a mere instrumentality or alter ego.'"  *In re Hedged-Investments Assocs., Inc.*, 380 F.3d 1292,

1301–02 (10th Cir. 2004) (citations omitted). It is not enough to simply demonstrate that the

defendant engaged in "inequitable conduct"; rather, the party

seeking equitable subordination must demonstrate conduct that fits within one of these three

paradigms. *In re Eufaula Indus. Auth.,* 266 B.R. at 489. Moreover, a court must apply different

levels of scrutiny to "insiders" and "non-insiders" of the debtor corporation. *In re Hedged-*

*Investments Assocs., Inc.,* 380 F.3d at 1301–02. Where a claimant is an insider or a fiduciary, the

party seeking subordination needs to show "unfair conduct, and a degree of culpability, on the

part of the insider." *Id.* However, if the claimant is not an insider or a fiduciary, the party

seeking subordination must "demonstrate even more egregious conduct such as gross

misconduct tantamount to fraud, misrepresentation, overreaching or spoliation." *In re*

*Castletons,* 990 F.2d at 559 (internal quotations omitted); *see also In re Sunbelt Grain WKS, LLC*, 427

B.R. 896, 908 (D. Kan. 2010) (where party does not put in allegations or evidence of insider

status, higher burden must apply showing conduct that is "'gross and egregious, tantamount to

21

fraud, misrepresentation, overreaching or spoliation, or moral turpitude.'") (citations omitted).
Where non-insider claims are involved, the level of pleading and proof required from the
pleading party is "significantly higher." *In re Eufaula Indus. Auth.,* 266 B.R. at 489. The
circumstances under which equitable subordination can apply to a non-insider creditor are "few
and far between" because a non-insider creditor "generally owes no fiduciary or contractual duty
to the other creditors of a debtor [and therefore] must be found to have engaged in some
specific conduct that gave rise to a fiduciary, contractual, or other legally recognized duty to the
other creditors before its claim will be equitably subordinated." *Id.* (quotations and citations
omitted).

      The Trustee has put forth no affirmative evidence of Gordian's insider status. *See
generally In re Tankersley*, 382 B.R. 522, 525 (Bankr. D. Kan. 2008) (burden on proof is on alleging
party). The record shows that Gordian does not fall into the statutory definition of an insider
*per se (see* 11 U.S.C.A. § 101) by virtue of ownership because it was never able to acquire the
RALOI shares and, therefore, Gordian does not own or have an ownership interest in LPAI,[5]
SOF ¶¶ 9-14; 22-23; *see also, e.g., In re QuVis, Inc.,* 446 B.R. 490, 501–02 (Bankr. D. Kan. 2011),
*aff'd sub nom.* In re QuVIS, Inc., 469 B.R. 353 (D. Kan. 2012), *aff'd*, 504 F. App'x 747 (10th Cir.
2012) (creditor not a non-statutory insider when it owned no equity in the debtor). Nor is
insider status automatically imputed to Gordian though its affiliation with the Modells. *See, e.g.,
In re QuVIS, Inc.,* 469 B.R. 353, 367-70 (D. Kan.), *aff'd*, 504 F. App'x 747 (10th Cir. 2012)
(secured lender was not "de facto director" of Chapter 7 debtor, so as to make lender a
statutory insider of debtor, by virtue of its managing director's position as director on debtor's

---

[5] Nor could the Trustee point to the factually inaccurate bankruptcy filings by Nazar to prove
any insider status to satisfy his burden. *See generally In re Tankersley*, 382 B.R. 522, 525 (Bankr. D.
Kan. 2008) (trustee's evidence did not sustain his burden of proof where only support offered of
insider status was the designation by debtor on statement of financial offers; listed designation
was more for debtor's own protection and not dispositive on the issue and Trustee should have
conducted further investigation on the statement). Here, further investigation would have
revealed that although Gordian initiated a transaction for the RALOI shares to obtain ownership
of LPAI, the transfer of the shares and ownership rights was never completed. SOF ¶¶ 9-14, 22-
23.

22

board of directors); *In re U.S. Medical, Inc.,* 531 F.3d 1272, 1281–82 (10th Cir.2008) (rejecting chapter 7's trustee argument for insider status that creditor was a de facto director of debtor because creditor's CEO was on debtor's board even where creditor had exclusive distributorship agreement with debtor, was sole manufacturer of debtor's product, held stock ownership interest in debtors, and had right to designate director on debtor's board).

Nevertheless, even applying the lower standard required for an insider, the Trustee's equitable subordination claims failed because he has not proven any inequitable conduct by Gordian.

1.    Gordian Played No Part In The Dorset Road Transaction.

The Trustee had failed to prove, or even allege with any specificity, how Gordian played any part in the agreement for Dorset Road's purchase of engine parts from LPAI ("Dorset Road Transaction"). *See* Compl. at ¶¶ 21-25 and throughout. The undisputed facts in the record show that it did not. Gordian did not own or have an ownership interest in LPAI. SOF ¶¶ 22-23. Gordian is not a party to the Dorset Road Transaction, and Gordian is not a shareholder or owner of Dorset Road. SOF ¶¶ 17-18. Nor is Gordian a party to the agreement between Dorset Road and Idicom. SOF ¶¶ 17-19. Any claim for payment LPAI would have in connection with the Dorset Road Transaction would be against Dorset Road, not Gordian. SOF ¶¶ 17-20. *See generally In re Eufaula Indus. Auth.*, 266 B.R. at 490–91 (no equitable subordination because Bank did not engage in any form of misconduct where Bank performed its duties under Indenture agreement, made no representations to Plaintiffs, owed no fiduciary duty to Plaintiffs, and was not party to the contracts between Plaintiffs and third party). Trevor Modell entered into the Dorset Road transaction as director on behalf of Dorset Road and for the benefit of Dorset Road, not Gordian. SOF ¶¶ 17-20. Liability for any individual acts by Modell cannot attach to Gordian because Trevor Modell was acting outside scope of his agency as director of Gordian for the benefit of Dorset Road, not Gordian. *See, e.g., Girard v. Trade Professionals, Inc.,* 13 F. App'x 865, 868 (10th Cir. 2001) (principal not liable where agent not acting in furtherance of

23

employer's business and outside scope of his authority. Liability to principal "'does not attach to the employer if there is only incidental furtherance of the employer's business.'"). Whatever claims the Trustee may have against the Modells in their individual capacity cannot be imputed to Gordian in an attempt to thwart its secured claim. *Id.*

The Trustee's unsupported allegations that Gordian, through the Modells, caused Dorset Road not to pay LPAI, to the detriment of other creditors, is also entirely nonsensical. Both Dorset Road and LPAI would have benefitted financially from the transaction, SOF ¶¶ 17-20, which would have indirectly benefitted Gordian. Dorset Road paid for the shipping of the goods because LPAI could not afford to, but rejected the goods because they were defective. SOF ¶¶ 19-20. As a result, Dorset Road suffered a financial loss and was unable to fulfill its contract with Idicom, and Dorset Road itself had to be placed into bankruptcy because of the failed transaction. SOF ¶¶ 19-21. As a result, Gordian lost its entire cash layout in LPAI which had no hope of continuing business and becoming financially viable. SOF ¶¶ 22, 28. Nevertheless, equitable subordination would still be improper here because "undercapitalization by itself is not inequitable conduct." *In re Hedged-Investments Assocs., Inc.*, 380 F.3d at 1302; *see also In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1155–56 (10th Cir. 2015) (no inequitable conduct on part of director. Company did not become alter ego of its majority shareholder simply because shareholder funds project that will ultimately benefit him, nor is undercapitalization itself inequitable conduct).

2.     The Trustee Has Not Proved Any Inequitable Conduct.

The Trustee has failed to satisfy his burden to show how Gordian's purchase of the CBT Loan evidences inequitable conduct so as to entitle the Trustee to equitable subordination of Gordian's Claim. *In re Hedged-Investments Assocs., Inc.,* 380 F.3d at 1301–02 (party seeking subordination needs to show "unfair conduct, and a degree of culpability, on the part of the insider."); *see also In re Sunbelt Grain WKS, LLC,* 427 B.R. 896, 908 (D. Kan. 2010) ("The moving party does not need to prove a negative on an issue that the opposing party must prove at trial.

24

Rather, the moving party only needs to point to an absence of evidence in support of the non-moving party's claim."). Moreover, because subordination is an "extreme remedy ….a claim of even 'probable' unfair conduct" cannot serve as the basis to subordinate a claim. *In re Alternate Fuels, Inc.,* 789 F.3d at 1156.

The CBT Loan existed and was perfected before LPAI was placed into bankruptcy. SOF ¶¶ 2-6, 24-25. The CBT Loan, while owned by CBT, was never challenged as being unperfected or unenforceable. SOF ¶¶ 2-6, 24-25. Once ESL purchase the CBT Loan, Gordian knew that ESL could foreclose on it, and take over LPAI and all its assets, to its detriment, and bought the CBT Loan as a way to avoid foreclosure. SOF ¶¶ 25-26, 29. The CBT Loan could have been purchased from ESL by another present or potential creditor, and it would have been paid as a secured claim before any unsecured claims, even if Gordian did not purchase it. The Trustee has not shown how Gordian's purchase of an already existing superior liability to the estate was unfair to the other creditors. Gordian's conduct was not inequitable and subordination is unwarranted. *See, e.g., In re Repository Technologies, Inc.*, 281 B.R. 852 (N.D. Ill. 2008) (debtor's former director and CEO did not engage in any "inequitable conduct" of kind warranting equitable subordination of his claim when he, while standing in fiduciary capacity to corporation, used his personal funds to acquire corporation's loan from bank at its full face value, and by delivering default notice to debtor on same day that he resigned as director, where he received no special benefit in acquiring the loan due to his affiliation with the corporation and took no action which could not have been taken by non-inside creditor, and where debtor and its creditors did not suffer any damages as a result of former director's actions); *In re Alternate Fuels, Inc.*, 789 F.3d at 1155(no inequitable conduct where shareholder obtained note and assignment of judgment proceeds when business was no longer engaged in active operations and where shareholder funded a project through the company that ultimately benefitted him); *In re Hedged-Investments Assocs., Inc.,* 380 F.3d at 1297 (neither lender's lack of due diligence in making loan to thinly capitalized corporate debtor that was being operated by its principal as part of Ponzi

25

scheme nor similarities existing between lender's return on loan and returns promised to investors in Ponzi scheme rose to level of "inequitable conduct" on lender's part, of kind required for equitable subordination of lender's claim)*; see also generally, e.g., In re Castletons, Inc., 990 F.2d 551, 559 (10th Cir. 1993)* ("District court's findings that bank took appropriate, justifiable actions to protect its security interest in debtor's assets, and that Chapter 7 trustee failed to show any unfair advantage to bank or damage to other creditors, were not clearly erroneous, and, therefore, bank's claim could not be equitably subordinated, even though bank froze debtor's checking accounts and offset amount of those accounts against debts owed to bank, and bank thereafter refused to honor debtor's check and applied funds from that check against debtor's loan…") (citations omitted).

The Trustee has also failed to put forth any evidence, or even any specific allegations, as to how Gordian was "an integral part" part of the Modells allegedly abandoning LPAI and the Trustee has offered no proof for his unsupported claim that LPAI could have been reorganized. Compl. ¶¶27.

Moreover, the Trustee's objection to Gordian's Claim is also duplicative of its equitable subordination claim in this adversary action and, therefore, should be overruled and denied for the same reasons.

**B.    Gordian's Claim Cannot Be Equitably Subordinated Based Upon The Conduct Of ESL Because Gordian Is Not An Assignee Of ESL For All Purposes (Count II).**

The Trustee conflates the actions of ESL, Jaffe and D'Aubigny -- against whom he has not initiated any adversary action or joined in the instant action -- with Gordian.  The Trustee has failed to establish any evidence to support his request for equitable subordination of *Gordian's* Claim based upon the unrelated conduct by ESL, Jaffe and/or D'Aubigny.  *See, e.g., In re Sunbelt Grain WKS, LLC*, 427 B.R. at 908 (D. Kan. 2010) (burden of proof of equitable subordination is on claimant).

Case 17-05030    Doc# 45    Filed 03/20/18    Page 31 of 44

Neither ESL, Jaffe nor D'Aubigny have any ownership interest in Gordian. SOF ¶ 8. They are not officers or directors of Gordian. SOF ¶ 9. Other than ESL's sale of the CBT Loan to Gordian, there is no evidence to support any connection between ESL, Jaffe, and/or D'Aubigny to Gordian. SOF ¶¶ 8-9, 30. The validity and enforceability of the CBT Loan and its transfer to ESL has never been challenged by LPAI or the Trustee. SOF ¶¶ 3, 27, 42. Upon transfer and assignment of the CBT Loan to ESL, ESL acquired all rights and liabilities of CBT in connection with the CBT Loan. SOF ¶ 25.

Gordian's subsequent purchase of the CBT Loan from ESL was conducted at arms' length, and Gordian purchased all rights from ESL that it acquired pursuant to the CBT-LPAI Sale Agreement. SOF ¶ 29; Ex. JJ at §1. As part of the sale, Gordian released ESL from any obligations it owed to CBT. SOF ¶ 29; Ex. JJ at §6. Gordian, therefore, now owns the rights CBT had in the CBT Loan which CBT sold in their entirety to ESL. Gordian through its acquisition of the CBT Loan, replaced ESL as assignee, and acquired all rights and liabilities of CBT in connection with the CBT Loan. SOF ¶¶____. As such, neither ESL, Jaffe nor D'Aubigny has any interest in Gordian's Claim which is exclusively based upon the CBT Loan. Since CBT was the original assignor to ESL, who then assigned the CBT Loan to Gordian, Gordian has stepped into the proverbial shoes of CBT, and can only responsible for the rights and liabilities arising in connection with the CBT Loan which remained unchanged after it was assigned to ESL and later Gordian. *See generally OXY USA, Inc. v. Colorado Interstate Gas Co.,* 20 Kan. App. 2d 69, 79, 883 P.2d 1216, 1223 (1994) ("'[I]t is axiomatic that an assignee of a promissory note stands in the shoes of the assignor and obtains the rights, title, and interest that the assignor had at the time of the assignment. … the assignee of a debt ordinarily obtains all remedies which were available to the assignor against the debtor for the enforcement of the obligation.") (citations and quotations omitted). By virtue of its purchase of the CBT Loan, Gordian cannot be responsible for ESL's or D'Aubigny's actions arising outside of the CBT Loan. *See generally Guar. Nat. Ins. Co. v. McGuire,* 192 F. Supp. 2d 1204, 1208 (D. Kan. 2002) ("The

27

court finds this rationale, which focuses on events subsequent to the date of assignment, to be strained. It is the date of the assignment which controls for purposes of determining the parties' rights."); *see also, generally Gillespie v. Seymour*, 19 Kan. App. 2d 754, 764-65 (1994) (accounting partnership was not subject to successor liability with regard to acts of accountant while he was with predecessor partnership).

The Trustee's has offered no evidence to support his barebone allegation that ESL, Jaffe and/or D'Aubigny were LPAI insiders. Accordingly, the heightened burden of proof for equitable subordination would apply here. *See In re Sunbelt Grain WKS, LLC*, 427 B.R. at 908 (heightened standard applies where no evidence of insider status). Moreover, there is no evidence of egregious conduct perpetrated by ESL, Jaffe, or D'Aubigny in connection with the CBT Loan – or anything else. Nevertheless, such conduct, even if it existed, could not transfer to Gordian simply because it purchased the CBT Loan from ESL.

**C.      The Trustee Is Not Entitled To Turnover From Gordian And Gordian Did Not Breach Any Fiduciary Duty to LPAI (Count III).**

1.      Turnover Is Improper Because Gordian Never Had Any Control Of The Dorset Road Assets.

The Trustee's claim for turnover of the Dorset Road engine parts should be dismissed because the Trustee has failed to prove that Gordian was an entity "in possession, custody, or control" of the engine parts or proceeds as required by 11 U.S.C. §542(a). Here, there can be no turnover from Gordian because the Trustee's allegation that Gordian had control over the engine parts included the Dorset Road Transaction is unsupported by the undisputed evidence in this case, as well as by public records that the Trustee could have consulted before the filing of his adversary action. *See* Compl. ¶¶ 34-37.

Gordian has no involvement in the Dorset Road Transaction. SOF ¶¶ 17-20. Gordian did not control or own Dorset Road and was not a shareholder in Dorset Road. SOF ¶ 18. Since it did not control Dorset Road, it also could not have controlled any engine parts shipped

28

to Dorset Road, even had those parts remained in Dorset Road's possession. SOF ¶ 18. Moreover, Gordian has no right to, or any benefit under, the Dorset Road Transaction, or the Dorset Road Idicom contract, and was not a party to either. SOF ¶¶ 17-20. Gordian does not, and has never, possessed the engine parts shipped to Dorset Road as part of the Dorset Road Transaction. As such, the Trustee cannot compel Gordian to turn over assets, or any debt allegedly owed in connection with them, because Gordian was never in possession of any of the estate's alleged Dorset Road assets. *See generally In re Graves*, 609 F.3d 1153, 1158 (10th Cir. 2010) (trustee could not compel turnover where debtor had no right to possess or use property at commencement of the case); *In re Sun Spas by Schaeffer, Inc.,* 122 B.R. 452, 455 (Bankr. M.D. Fla. 1990) (court cannot enter monetary judgment or require turnover of property from defendants with no possession or control of or ownership interest in debtor's property). The Trustee has failed to demonstrate that Gordian controlled the products that were subject to the Dorset Road transaction, that Gordian ever possessed them, or why he is entitled to turnover. Nor can he because no such evidence exists in this record, and the Trustee sought no discovery on this subject. Moreover, Patton, the Trustee's self-proclaimed basis for his claims, testified that the parts were shipped back to LPAI, and, as such, the parts would be in the custody and control of LPAI. SOF ¶ 68.

        2.    <u>Gordian's Purchase Of The CBT Loan Was Not A Breach Of Fiduciary To LPAI.</u>

As discussed *supra*, Gordian never secured an ownership interest in LPAI, so could not have affirmatively assumed any fiduciary duty with LPAI. *See supra,* section IA; *see also, generally Flight Concepts Ltd. P'ship v. Boeing Co.,* 819 F. Supp. 1535, 1545 (D. Kan. 1993), *aff'd,* 38 F.3d 1152 (10th Cir. 1994) (no fiduciary relationship found where no indication that company consciously assumed fiduciary duties as to designer, or that designer placed its property or business in company's hands to operate primarily for designer's advantage). Nevertheless, even if Gordian

29

did have a fiduciary duty, it did not breach the duty by purchasing the CBT Loan because it did not usurp LPAI's corporate opportunity to buy the CBT Loan.

In order for the Trustee to show that Gordian usurped LPAI's opportunity to buy the CBT Loan, he must show the 1) existence of a corporate opportunity, 2) that LPAI was capable of taking advantage of the opportunity, and 3) intended to take advantage of that opportunity. *See In re Robustelli*, 430 B.R. 709, 725-30 (N.D. Georgia 2010) (theoretical ability to pursue customers not enough). It is undisputed that LPAI would not have been capable of purchasing the CBT Loan. LPAI could not pay its interest and service fees on the CBT Loan had already defaulted twice on it before declaring bankruptcy. SOF ¶ 24. LPAI could not pay its bills or employee wages. SOF ¶ 15. It had no usable inventory and its only potential customer in the last six months before bankruptcy was Dorset Road. SOF ¶¶ 15, 28. LPAI had no future contracts that could possibly make it economically viable before filing for bankruptcy. SOF ¶ 15, 28. At the time Gordian purchased the CBT Loan, LPAI was already in bankruptcy proceedings. SOF ¶ 29. Gordian, therefore, did not usurp any opportunity that LPAI was capable of acting on by purchasing the CBT Loan. *See In re Lake Country Investments*, 2001 WL 267475 at *10-13 (Bankr. D. Idaho 2001) (insider, in paying off a claim of the company's secured creditor and acquiring creditor's secured positions, at a time when company had no evident ability to deal with debt and creditor was threating to foreclose, did not usurp any opportunity available to the company, and did not engage in any inequitable conduct to the injury of the general creditors or conferring an unfair advantage upon the insider, so as to justify equitable subordination). Moreover, the Trustee has put forward no evidence that establishes that LPAI could or ever intended to purchase the CBT Loan. *See In re Robustelli*, 430 B.R. at 725-30 (corporation had no viable claim against founder's son for usurpation of corporate opportunities given lack of evidence that corporation had capacity to undertake any business opportunity that son may have appropriated where corporation did not have any customer contracts in place, no evidence in record that corporation attempted to continue business after son's resignation, and

30

founder took no effort to stop son's activities. Court found that just because corporation theoretically could have continued business, there was no evidence it actually intended to do so); *see also Rajala v. Gardner*, No. 09-2482-EFM, 2012 WL 1189773, at *18 (D. Kan. Apr. 9, 2012), *aff'd*, 709 F.3d 1031 (10th Cir. 2013) (individual members did not usurp corporate opportunity where they were under no obligation to bring every opportunity to corporation under operating agreement). Accordingly, the Trustee's breach of fiduciary duty claim fails.

3.     The LP IP Should Not Be Equitably Subordinated.

The Trustee is not entitled to equitable subordination of the LP-IP. The LP-IP is an asset owned and acquired by Gordian from LP Ltd. after the filing date. There is no factual dispute that LPAI never owned or even possessed the LP IP. Nor was the LP IP ever a valid or enforceable security for the CBT Loan. *See In re Graves*, 609 F.3d at 1158 (trustee could not compel turnover where debtor had no right to possess or use property at commencement of the case).

LP Green placed the LP IP as additional security on behalf of LPAI to the CBT Loan. SOF ¶ 7. However, the LP IP was never LP Green's to transfer, and the transfer was invalid. SOF ¶¶ 32. Moreover, LPAI itself never had any ownership interest in the LP IP. SOF ¶¶ 35-37. It is also undisputed that Gordian purchased the LP-IP separately from the CBT Loan in an unrelated transaction after it purchased the Loan. SOF ¶¶ 33-34.

Furthermore, the Trustee has failed to prove any improper conduct of Gordian, including, as discussed *supra*, because Gordian's purchase of the CBT Loan is not a breach of fiduciary duty to LPAI – even if it owed a duty to LPAIS *See* 11 U.S.C. §510(c); *In re Lake Country Investments*, 2001 WL 267475 at *10-13 (in acquiring creditor's secured position, insider did not breach fiduciary duty and did not usurp any opportunity available to the company, and did not engage in any inequitable conduct to the injury of the general creditors or conferring an unfair advantage upon the insider, so as to justify equitable subordination).

31

**D.**     **The Trustee Is Not Entitled To Marshalling And The Court Should Determine The Value Of Gordian's Claim (Count IV).**

    1.     The Court Should Determine The Value Of Gordian's Claim Under The CBT Loan.

The Court has already heard all the evidence concerning the value of the CBT Loan and Gordian's Claim at the Stay Trial. That record remains unrefuted by the Trustee.

The original secured CBT Loan was issued by CBT to LPAI. SOF ¶¶ 2-6, 24. CBT demanded payment from LPAI on the CBT Loan balance and related fees in the total amount of $2,048,022.57. SOF ¶ 24. CBT's right to payment of that amount, and its enforceability was never challenged by LPAI or the Trustee. SOF ¶¶ 3, 24, 42; Ex. SS. CBT's sale of the CBT Loan to ESL confirmed that the value of the CBT Loan was $2,048,022.57. CBT's loan officer, William Dippel, confirmed the value of the CBT Loan to be in excess of $2 million during his deposition in these proceedings. SOF ¶ 25. The Trustee has not and cannot demonstrate any payment made at any time to be applied against and in reduction of any obligations due pursuant to the CBT Loan.

Moreover, this Court has already recognized that Gordian has a perfected claim, subject only to a limited carve out for costs. SOF ¶¶ 27, 42. The only evidence the Trustee points to as support for its $304,000 valuation of the CBT Loan is the number inserted by LPAI's bankruptcy counsel in LPAI' Petition and related filings. The evidence at the Stay Trial, however, established that the information inserted in those forms was an estimate of what ESL paid to purchase the CBT Loan, not the CBT Loan's actual value. SOF ¶ 49. The value of the CBT Loan was indisputably established during the Stay Trial to be in the amount of $2,048,022.57. SOF ¶ 47. It is undisputed that Nazar knew this amount to be the value of the CBT Loan well prior to filing LPAI's Petition, and could have amended the Petition and supporting papers to provide for it accurately. SOF ¶ 47; Ex. SS.

32

Accordingly, the Court should determine that the value of Gordian's secured claim to be $2,048,022.57, lift the Automatic Stay, and determine that Gordian is not judicially estopped from asserting the amount in full.

2. The Trustee Is Not Entitled To Marshalling Or Disallowance Of Claim

The Trustee argues 1) that since the LP-IP is allegedly valued at more than Gordian's claim, it should be applied against Gordian' claim and the value of the LP-IP should be marshalled to the Trustee and the estate; and 2) that Gordian's claim should be disallowed because the CBT Loan never transferred to Gordian because of the conduct of D'Aubigny. Compl. ¶¶ 41-44.

First, Marshalling of assets is an equitable doctrine for the purpose of protecting a junior creditor. *See In re Blagg*, 372 B.R. 502, 506–07 (Bankr. D. Kan. 2007) ("[P]urpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security."). "For marshaling to apply, the movant must establish three elements: (1) the existence of two or more creditors competing against the same debtor; (2) the existence of two or more funds belonging to the debtor; and (3) the legal right of at least one creditor to satisfy its claim against either of the funds, when the other creditor has access to only one fund." *In re Miller*, 378 B.R. 418, 2007 WL 2332391 at *2-3 (B.A.P. 10th Cir. August 16, 2007) (trustee not entitled to marshalling when he did not meet his burden to satisfy the elements). There is no evidence to support the Trustee's allegations and the Trustee has not met and cannot meet the requirements for marshalling.

The Trustee has identified no junior *secured* creditor that would benefit from marshalling. *See In re Blagg*, 372 B.R. at 507 ("The doctrine benefits junior *secured* creditors. It 'applies when a senior-secured creditor can collect on its debt against more than one property or fund held by the debtor, while a junior-secured creditor can proceed against only one of those sources.'") (emphasis added). Furthermore, the Trustee cannot satisfy the requirement that two or more funds belonged to the debtor because LPAI never had any interest or ownership rights in the

33

LP-IP.  SOF ¶¶ 35-37.  The LP-IP was never a valid security for the CBT Loan because the pledger did not own any rights in it.  SOF ¶¶ 31-33.  LPAI did not own, possess or have any rights in the LP-IP at any time, including at the time the Petition was filed.  SOF ¶¶ 31-37. Gordian purchased the LP-IP separately from and after it purchased the CBT Loan. SOF ¶ 34. *See In re Blagg*, 372 B.R. at 506–07 (Bankr. D. Kan. 2007) (court-

ordered marshaling requires two funds belonging to the debtor and "'[t]he two funds or properties to be marshaled must exist at the time the equitable relief is sought, and the two properties must be in the hands of the common debtor at the time the marshaling proceeding is commenced.'") (citations omitted).  The Trustee and the estate are, therefore, not entitled to marshalling of the value of the LP-IP.  *See, e.g., In re Miller,* 2007 WL 2332391 at *2-3 (trustee not entitle to marshalling of Debtors' tax fund because debtors did not have possession over fund as it was assigned pre-petition); *In re Blagg,* 372 B.R. at 506–07 (no marshalling where first element for marshaling was not present because the creditors involved were not secured creditors, and the doctrine's entire purpose is to benefit junior secured creditors, 2) there were not two separate funds subject to a lien by a senior lien holder, and 3) debtors never had the purported "two funds" in their possession); *In re Henderson*, No. 05-42351, 2007 WL 4410222, at *2 (Bankr. D. Kan. Dec. 14, 2007), *aff'd sub nom. In re Sherlock*, No. 07-4145-JAR, 2008 WL 4277719 (D. Kan. Sept. 11, 2008) (same). The Trustee should not be granted marshalling because he has not sustained his burden.

        As a last resort, the Trustee also argues that Gordian's claim should be disallowed under 11 U.S.C. §502(d) and that the CBT Loan indebtedness never transferred to Gordian because of the actions of D'Aubigny.  Compl. at ¶¶42, 44.  The Trustee has established no evidence that could support its allegations and justify the Court's disallowance of Gordian's acclaim. Certainly, the alleged actions of a third party against whom the Trustee has filed no claims, and has no evidence to support those allegations, is not a sufficient or equitable reason to disallow Gordian's Claim.  Indeed, LPAI has never even challenged the validity of the CBT Loan, before

34

or after CBT sold it to ESL. *See generally In re Taylor*, 289 B.R. 379, 384 (Bank. N.D. Ind. 2003) (claims may only be disallowed for one of the reasons enumerated by Congress in the statute). The Trustee's baseless conjecture against *other* parties not before this Court cannot be used against Gordian to alter its right to its secured claim.

As the Trustee has incorporated his objections to Gordian's claim in his request for marshaling and request for determination, the Trustee's objections should be denied in their entirety for the same reasons. Compl. at ¶41.

E.    **The Trustee's Claim For Avoidance Of Fraudulent Obligation Makes No Allegations Against Gordian (Count V).**

The Trustee claims he may avoid Gordian's Claim because LPAI's increased obligation to CBT under the CBT Loan was fraudulent because a) the increased funds were disbursed solely to affiliates controlled by D'Aubigny, and b) LPAI didn't receive a reasonable equivalent value in exchange for the increase, which led to its insolvency, it had too little capital to engage in the transaction, and the debt was beyond LPAI's ability to pay. Compl. ¶¶ 45-48. *See* 11 U.S.C. §548(a)(1)(B). The Trustee's claim for avoidance of fraudulent obligation does not include any allegation of any conduct by Gordian, and is alleged entirely against D'Aubigny and his affiliates. However, D'Aubigny and his "affiliates" are not parties to this action. Nor is there any evidence whatsoever to identify the individuals who are D'Aubigny's "affiliates." Compl. ¶¶ 45-48. CBT and LPAI frequently amended the CBT Loan in accordance with LPAI's business needs. SOF ¶¶ 2, 4-5. The CBT Loan was never challenged by LPAI. SOF ¶¶ 2-6; Ex. SS. There is no evidence to support the Trustee's assertion that LPAI did not receive the monies advanced under the CBT Loan, or that it otherwise was unable to take advantage of the full value of those cash advances. Moreover, the Trustee has put forward no evidence of any payments made by LPAI on the increased indebtedness that could otherwise have been applied to any of its other debt obligations. Compl. ¶48. The Trustee has failed to pursue any action again D'Aubigny and cannot use mere conjecture against D'Aubigny, to whom Gordian has no connection, to avoid

35

payment of Gordian's Claim. *See generally In re Expert S. Tulsa, LLC,* 534 B.R. 400, 413 (B.A.P. 10th Cir. 2015), *aff'd,* 842 F.3d 1293 (10th Cir. 2016) (party seeking to avoid transfer bears burden).

F. **The Trustee Is Not Entitled To An Additional Assessment Of Costs (Count VI).**

The Trustee is seeking additional costs for the preparation of the 2015 estate tax returns against under 11 U.S.C. §506(c). Section 506(c) states that a "trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property". 11 U.S.C. §506(c). *See generally, e.g., In re Bob Grissett Golf Shoppes, Inc.,* 50 B.R. 598 (Bkrtcy.E.D.Va.1985) (allowed to the extent for recovery of expenses from secured party any time the debtor-in-possession expended money to provide for reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral).

Here, however, the Trustee is not asking for additional funds to preserve or dispose of Gordian's collateral, but only for use of the general estate. The Court has already provided for a Carve Out for costs, and the Trustee has provided no explanation why he did not seek to use the Carve Out provision in an attempt to cover the costs relating to the filing of the estate's taxes. The Trustee has, again, asserted no allegation against Gordian, much less any that would entitle him to further stall payment of Gordian's Claim. Compl. ¶¶ 49-52.

II. **SANCTIONS SHOULD BE AWARDED AGAINST THE TRUSTEE AND TRUSTEE'S COUNSEL PURSUANT TO 28 U.S.C. § 1927.**

A court has "the inherent authority to assess attorney fees against a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Dreiling v. Peugeot Motors of Am., Inc.,* 768 F.2d 1159, 1164 (10th Cir. 1985) (citations and quotations omitted); *see also Olympia Co., Inc. v. Celotex Corp.,* 771 F.2d 888, 893 (5th Cir. 1985) (finding that client and counsel "should be jointly assessed the sanctions of expenses, attorneys' fees, and double costs" where party "failed

to produce any evidence of antitrust injury and its theory of damages has been expressly rejected by this Court in prior case law").

Pursuant to 28 U.S.C. § 1927 a court may also assess excess costs, expenses, and attorney fees reasonably incurred personally against any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously....'" because of their actions. 28 U.S.C.A. § 1927 (West); *see also Dreiling v. Peugeot Motors of Am., Inc., 768 F.2d at 1164-65* ("Under § 1927, a district court may assess an award of fees against an attorney appearing before the court if (1) the actions of the attorney multiply the proceedings and (2) the attorney's actions are vexatious and unreasonable."); *Baulch v. Johns*, 70 F.3d 813, 817 (5th Cir. 1995) ("§ 1927 sanctions are appropriate when an attorney has acted in bad faith, with improper motive, or with a reckless disregard of the duty owed to the court"). Moreover, the statute exists "to provide an 'incentive for attorneys to regularly re-evaluate the merits of their claims and avoid prolonging meritless claims.'" *Bixler v. Foster*, 403 F. App'x 325, 328 (10th Cir. 2010) (citation omitted).

The Trustee and his counsel were well aware that there was no basis for this adversary action against Gordian. During the Stay Trial, the Trustee misled the Court about 1) the discovery that he intended to take to prove his claims in the adversary action, and 2) the existence of evidence through Scot Patton to substantiate the Trustee's claims. SOF ¶¶ 50-53; *see Fish v. Kobach*, 320 F.R.D. 566, 573 (D. Kan.) (sanctions warranted where counsel deliberately misled court in misstating evidence during discovery dispute); *Herzfeld & Stern v. Blair*, 769 F.2d 645, 647 (10th Cir. 1985) (sanctions proper where counsel did not operate in good faith where his references to the record that were contrary to what was found "indicate that he has been either cavalier in regard to his approach to this case or bent upon misleading the court.").

The Trustee made little effort to prove the baseless allegations he asserted against Gordian in the adversary complaint. With the exception of one CBT deposition, originally noticed by Gordian, the Trustee issued no new relevant discovery in this case. SOF ¶¶ 60-61. Moreover, the third party discovery taken by Gordian revealed that the Trustee's allegations in

the complaint concerning Gordian, including Gordian's ownership rights in LPAI, the ownership of the LP-IP, and the amount of Gordian's Claim were unsupported by any facts. SOF ¶¶ 22-23, 31-37, 49, 62, and throughout. Once discovery was complete, and the Trustee was well aware that he had no evidence to support any or all of his claims, he was required to reevaluate and drop those claims. *Bixler v. Foster*, 403 F. App'x at 327-28 (counsel failed to re-evaluate the merits of her strategy once the writing was on the wall, pressing on with a futile matter" that unreasonably and vexatiously multiplied proceedings). Instead, he continues to press forward with claims that are meritless. In light of the Trustee's failure to make any effort to investigate or develop any facts to support his claims against Gordian, and his refusal to withdraw even a single claim given the undisputed record of this case, Gordian should be awarded its attorneys' fees and costs incurred in this action. *See, e.g., In re American Remanufacturers, Inc.*, 453 B.R. 235, 237-42 (Bankr. D. Del. 2011) (conduct of Chapter 7 trustee and his counsel in pursuing avoidance action and action to collect on accounts receivable against creditors even after it became clear that actions were not viable warranted award, to creditors, of their costs incurred since failed mediation, which was point at which conduct became clearly vexatious and unreasonable, to be assessed against trustee and counsel jointly and severally); *see, also Bixler v. Foster*, 403 F. App'x at 327-28 (affirming district court's award of attorney fees under the statute where deficiencies pointed out in motion to dismiss should have alerted plaintiff's attorney to fatal deficiencies in claim); *Dreiling v. Peugeot Motors of Am., Inc.*, 768 F.2d 1159 (10th Cir. 1985) (district court did not err in assessing costs and attorney fees against plaintiffs and their attorney in that findings were not clearly erroneous that plaintiff attorney, in bringing action against former dealer service representative of automobile manufacturer without grounds and continuing to assert claims for liability against him with knowledge that there was no factual or legal basis for claim of liability long after it would have been reasonable and responsible to have dismissed the claims acted to multiply the proceedings in an unreasonable and vexatious manner).

## CONCLUSION

For the reasons set forth herein, Gordian respectfully request that the Court: (i) grant its motion for summary judgment on all counts of the Complaint; (ii) dismiss the Complaint against it in its entirety; (iii) sanction the Trustee and the Trustee's counsel pursuant to 28 U.S.C. § 1927 and order that they pay Gordian's attorneys' fees and cost incurred in connection with this action; and (iii) grant Gordian such other and further relief as the Court deems just and proper.

Dated: March 20, 2018

Respectfully submitted,

MISHCON DE REYA NEW YORK LLP

By: /s/ Vincent Filardo, Jr.
    Vincent Filardo, Jr. (admitted pro hac vice)
    Lana Milojevic (admitted pro hac vice)
    Michael DeVincenzo (admitted pro hac vice)
    156 Fifth Avenue, Suite 904
    New York, NY 10010
    (212) 612-3270
    vincent.filardo@mishcon.com
    lana.milojevic@mishcon.com
    michael.devincenzo@mishcon.com

POLSINELLI PC

By: /s/ James E. Bird
    JAMES E. BIRD (KS USD #70365)
    900 W. 48th Place, Suite 900
    Kansas City, Missouri 64112
    (816) 753-1000
    Fax No. (816) 753-1536
    jbird@polsinelli.com

ATTORNEYS FOR
GORDIAN TRADING LIMITED UK

39