UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LISTER-PETTER AMERICAS | ) | Case No. 15-10502 |
| INCORPORATED, | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| J. MICHAEL MORRIS, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No. 17-5030 |
| | ) | |
| GORDIAN TRADING LIMITED UK; | ) | |
| TREVOR R. MODELL; | ) | |
| AND DEVON M. MODELL, | ) | |
| | ) | |
| Defendants. | ) | |

## TRUSTEE'S RESPONSE TO MOTION OF GORDIAN TRADING LIMITED UK FOR SUMMARY JUDGMENT

The Trustee has filed the Trustee's Response to Gordian's Statement of Uncontroverted Facts (Adv. Dkt. #51) and the Trustee's Statement of Uncontroverted Facts (Adv. Dkt. #50). He now files this brief in Response to Gordian's Motion for Summary Judgment.

### Summary Judgment Standards

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848 at 851 (10th Cir. 2003) (citing *Anderson v.*

1

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of a claim."  *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248).  Even if material facts are uncontroverted, summary judgment cannot be entered unless those facts demonstrate the movant is entitled to judgement under the applicable law.  *See Clifton v. Craig*, 924 F.2d 182, 183-84 (10th Cir. 1991).  In applying this standard, the court must "view the factual record and draw all reasonable inferences therefrom in the light most favorable to the nonmovant."  *Thom*, 353 F.3d at 851 (citation omitted).  The court determines "whether the evidence presents a sufficient disagreement to require submission to the [trial court] or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  If any inference can be deduced from the facts which would allow the non-movant to prevail, summary judgment is inappropriate.  *United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir. 1986).

     1.    **Background**

     A.    **Gordian and the Modells were insiders of the Debtors at all relevant times.**

     The Debtors are corporations.  From at least March 17, 2025 to June 25, 2015 (T Ex. 10; T.Ex. 15) both Modells were directors and, therefore, statutory insiders.  11 U.S.C. §101(31)(B)(i).  In January, 2015 Gordian entered into a Share Sale Agreement to purchase the shares of RALOI from the UK Liquidator (T Ex. 5).  Based on this purchase, Modell (one of three directors of Gordian) took charge of LPAI, including hiring Phillip Briggs as a manager, and authorizing the filing of a Chapter 11 for both debtors.  Gordian also paid some employees and Mr. Nazar's fee (G.Ex. N, 69).  The Modells could not have become directors, and Trevor Modell could not have taken charge, except through the rights of Gordian under the Share Sale

Agreement.  Gordian is therefore a "person in control of the debtor"[1] and also a statutory insider.

11 U.S.C. §101(31)(B)(iii):

> "Control" under §101(31)(B)(iii) "has no fixed definition" and "is often defined by example and by an examination of the facts." …  *In re UVAS Farming Corp,* 89 B.R. 889, 892 (Bankr.D.N.M. 1988).  Courts have focused on "operating control," … *In re Badger Freightways, Inc.*, 106 B.R. 971, 982 (Bankr. N.D. Ill, 1989).  …rather than "financial influence," *In re Octagon Roofing*, 124 B.R. 522, 530 (Bankr.N.D. Ill. 1991).  To be an  insider of the debtor, a person <u>need  not  have "legal or absolute" control</u> of the debtor.  …*In re K&R Mining, Inc.*., 103 B.R. 136, 139 (Bankr.N.D.Ohio 1988), <u>but "must exercise sufficient authority"</u> to "<u>dictate corporate policy and  the disposition of corporate assets</u>," *Badger Freightways*, 106 B.R. at 982 (internal quotation omitted).

*In re South Beach Securities, Inc.*, 376 B.R. 881, 889 (Bankr.N.D.Ill 2007) (emphasis added).

And see *In re Aluminum Mills Corp.*, 132 B.R. 869, 894 (Bankr.N.D.Ill 1991) (control over "[d]ecisions concerning the termination and replacement of executives, the release of claims, [or] the filing of a bankruptcy petition.")[2]

Gordian argues that "it was never able to acquire the RALOI shares and, therefore, [it] does not own or have an ownership interest in LPAI."  Gordian Brief, p. 22.  However, the fact that Gordian did not subsequently "complete" its purchase, does not mean it did not exercise actual control during all relevant times (March – June 2015) involved in this case.[3]

---

[1] "Person" includes corporations. §101(41).

[2] Statutory insiders also include an "affiliate" of the Debtor.  §101(31)(E).  "Affiliate", in turn, includes an "entity that <u>directly or indirectly</u> owns, <u>controls, or holds</u> with power to vote, 20 percent or more of the outstanding voting securities of the debtor … " §101(2)(A).  Here, Gordian purported to <u>own</u> or <u>hold all</u>  of RALOI's shares under the Share Sale Agreement, and in any event, <u>exercised</u> <u>control</u> over such shares.

[3] It is of note that the UK Liquidator was still reporting as of July 27, 2015 that he hoped to collect the balance of the purchase price from Gordian and was working with Modell for payment (G. Ex.T, 5 §1.5).  And, the reason the purchase was not completed was that "…the money dried up from Gordian."  (G.Ex R, 27).  The Share Sale Agreement (T Ex. 5) carefully provided that "Buyer has agreed to purchase such right, title, and interest (if any) as the Seller has in the Sale Shares (*Id*. p. 2 "Background" ¶[C]), and  "that if Seller does not have title or unencumbered title to the Sale Shares or if Buyer cannot exercise any right conferred or purported to be conferred

3

Gordian also argues that it cannot be an insider "automatically … th[r]ough its affiliation with the Modells."  Gordian Brief, pp. 22-23, citing the "de facto director" argument rejected in *In re U.S. Medical, Inc.*, 501 F.3d 1272 (10th  Cir. 2008) and *In re QuVis, Inc.*, 469 B.R. 353 (D. Kan.) *aff'd* 504 E. Appx. 747 (10th Cir. 2012).  In *U.S. Medical*, the Court rejected an argument that "because the CEO of [a] creditor [sued for a preference] was a director of the debtor, [the] creditor [itself] should be considered a 'de facto' director of debtor …, and therefore a <u>non-statutory</u> insider." 531 F.3d 1272, 1281 and n.8 (emphasis added).  The creditor owned less than 20% of the debtor.  The Court noted that the director there had been sensitive to any conflict and had not voted on any issues involving payment to the creditor (*Id.* at 1274, 1281).  Other cases which had used the "de facto director" language had different facts, including "… where the director takes steps to enrich the creditor."  (*Id.* at 1282).  *QuVis* rejected similar arguments ("de facto director" is simply a descriptive term used by some cases to explain the 'degree of control a creditor had over its debtor'), 469 B.R. at 369, and held that mere interlocking directors are not enough (*Id*. at 371).

Here, the trustee does <u>not</u> argue that Gordian is a "de facto director," (and therefore a <u>non-statutory</u> insider).  Rather the trustee argues that Gordian is a "person in control" under §101(31)(B)(iii) and a <u>statutory</u> insider (or an "affiliate" and also a statutory insider) because of its ownership.  Gordian is not an insider merely because of "its affiliation with the Modells".  Although, the evidence shows that Gordian and the Modells are intertwined, that, in itself, does

---

by this agreement, this shall not be grounds for rescinding …" (*Id*. p. 8, ¶7.6).  The Liquidator testified he did not have the Shares because they had  been transferred  without consideration to Lister Petter FZE (D'Aubigney). Although FZE agreed to return the shares, it never formally did.  He therefore had the equitable interest but not an "absolute" interest, which could be "perfected" (meaning registered) "[W]hilst we were endeavoring to resolve that imperfection, the money from Gordian dried up. so we lost interest in ever perfecting it." (G. Ex. R, 23-27).  Of course, the money from Gordian "dried up" <u>after</u> Gordian bought the CBT notes, and no longer needed the RALOI shares to assert control over LPAI's assets.

4

not make Gordian an insider. But, Gordian purchased the RALOI shares at the recommendation of Modell and the Modells could only have become directors of the Debtors because of that purchase. In this sense, it can be said that the Modells are insiders (as directors) because of <u>their</u> "affiliation" with <u>Gordian</u>.

Finally, Gordian should be <u>estopped</u> to argue it was not a statutory insider of the Debtor at all relevant times. First, the Statement of Financial Affairs for each Debtor, signed under penalty of perjury by Trevor Modell, state that Gordian "owns 100% of RA Lister Overseas Investments Limited", which in turn "owns 100% of Lister Petter US Holdings, Inc. " which owns 100% of Lister Petter Americas Inc." (T.Ex. 11; T.Ex. 12).

This creates a judicial estoppel:

> The purpose of judicial estoppel "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions." *New Hampshire v Maine*, 532 U.S. 742, 749, … (2001) …. When addressing judicial estoppel, courts typically consider three non-exclusive factors: (1) whether a party's later position is consistent with an earlier position; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing part if not estopped." *Id*. at 750-751, …; see *Eastman v. Union Pac. R.R. Co.,* 493 F.3d 1151, 1156 (10th Cir. 2007).

*Smith v United Parcel Service*, 578 Fed.Appx 755; 759-60 (10th Cir. 2014) (debtor who failed to disclose pending employment discrimination claim in bankruptcy judicially estopped from pursuing claim). All of the elements set out above are present in this case (1) for purpose of <u>filing</u> the bankruptcy, Gordian is the Debtor's owner (necessary for Modell to have control and authority to file the bankruptcy cases at all). For purposes of whether Gordian is an insider as to the CBT "claim", it is not the Debtor's owner. (2) The Court "accepted" the position that

5

Gordian was the Debtor's owner. Otherwise there would have been no authority to file the bankruptcy cases. (3) Gordian seeks to derive an unfair advantage over the other creditors of LPAI but "taking" for itself all of LPAI's assets, above and beyond even what Gordian paid for the CBT "claim".

Gordian argues that the bankruptcy filings were "factually inaccurate" and blames the Debtor's attorney, Mr. Nazar. Gordian Brief, p. 22 n.5. It cites *In re Tankersley*, 382 B.R. 522 (Bankr.D.Kan. 2008). *Tankersley* involved a complaint to recover a preference from an alleged insider. The only evidence of insider status was that the debtor had listed the defendant "… as an insider on her statement of financial affairs." And, other than such listing, "… there is no evidence of an insider relationship as that term is intended in §547." 382 B.R. 522.

The current case is far different. The statement of financial affairs does not simply refer to Gordian as an "insider", but sets out Gordian's specific (100%) ownership of the Debtors. It is this "100% ownership" that causes Gordian to be an insider, and the statement of financial affairs is evidence of that relationship. See also e.g. *Eastman v Union Pacific R. Co.*, 493 F.3d 1151, 1157 (10th Cir. 2007) (judicial estoppel based on debtor's non-disclosure, and rejecting "attorney fault" argument. Courts are "unpersuaded [by assertions that the] failure to disclose … was the result of good faith reliance on legal advice.")

Second, Gordian's ownership of the Debtors under the Share Purchase Agreement allowed Modell to take charge and assert operative control over LPAI. Gordian clearly knew Modell (one of its three directors) was doing so, and Gordian advanced funds for the Debtors, including Mr. Nazar's bankruptcy retainer. Gordian therefore put Modell in a position to file the bankruptcy and sign the schedules and statement of financial affairs. *Cf. Farm Bureau Mutual*

*Ins. Co. v Carr*, 215 Kan. 519, 597 528 P.2d 134 (1974) ("he who trusted the wrongdoer and placed the means in his hands to commit the wrong must bear the loss.")

### B.    <u>The Modells were also fiduciaries at all relevant times.</u>

A debtor in possession has the "rights …powers … and <u>duties</u>, … of a trustee …" §1107(a) (emphasis added).  Thus, a debtor in possession, like a trustee, is a fiduciary.  *In re Americana Expressways, Inc.*, 133 F.3d 752, 756 (10th Cir. 1997), citing *Commodity Futures Trading Comm'n v Weintraub*, 471 U.S. 343, 352-53 (1985) and *Wolf v Weinstein*, 372 U.S. 633, 651 (1963).

The debtor's directors bear the same fiduciary obligations to creditors and shareholders as the debtor in possession.  Further, the interests of shareholders are subordinate to the interests of creditors.  *Weintraub,* 471 US at 355.

Stated another way, "[d]ebtors in possession <u>and those who control them</u> owe fiduciary duties to the bankruptcy estate ….  Thus the [owners and managers of] a bankrupt [entity], acting as a debtor in possession, must run the business as agents of the bankruptcy estate, and not for their personal gain."  *In re Brook Valley VII, Joint Venture*, 496 F.3d 892, 900 (8th Cir. 2007) (emphasis added). See also *In re Aldephia Communications Corp.* 336 B.R. 610, 669 (Bankr.S.D.N.Y. 2006) <u>*aff'd*</u>  342 B.R. 122 (S.D.N.Y. 2006) (under Delaware law officers and directors have fiduciary duties and insolvency "affects the constituency on whose behalf the directors [act]."); *In re Honey Creek Entertainment, Inc.*, 246 BR 671, 692 (Bankr.E.D.Okla 2000) *rev'd in part on other grounds* 37 Fed.Appx. 442 (10th Cir. 2002) (directors bear same fiduciary duties as a trustee).

### C.  <u>The nature of a Debtor's and Director's fiduciary duties.</u>

Fiduciary obligations include the duty of care and the duty of loyalty.

> The duty of care requires the fiduciary to make good-faith decisions that can be attributed to a rational business purpose. ….
>
> The duty of loyalty comes into play when there appears to be a conflict between the interests of the fiduciary and the entity to which he owes loyalty. For a debtor in possession, this duty "includes an obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly and to maximize the value of the estate."

*In re Brook Valley VII, Joint Venture*, 496 F.3d at 900-01 (debtor's principals violated their fiduciary duties of loyalty by consenting to foreclosure sale and then purchasing property through another entity at a price less than appraised value).

The duty to maximize the value of the estate includes pursuing recovery of property for the benefit of the estate, *In re R&R Associates of Hampton*, 402 F.3d 257, 266 (1st Cir. 2005), including "[legal] claims … based upon the best interests of the estate." *In re Smart World Technologies, LLC* 423 F.3d 166, 175 (2nd Cir. 2005). And, the similar duty to conserve and protect assets includes pursuing accounts receivable. *In re Gibson Group, Inc.*, 66 F.3d 1436, 1442 (6th Cir. 1995).

There is also a duty to keep the court and creditors informed about the nature, status and condition of the business undergoing reorganization. *In re Celeritas Technologies, LLC*, 446 B.R. 514, 520 (Bankr.D.Kan. 2011). ("One of the most fundamental and crucial duties of a debtor-in-possession …"); *In re Nartron Corp.*, 330 B.R. 573, 593 (Bankr.W.Mich. 2005) ("…open, honest and straight forward disclosure to the court and creditors" … "part of the debtor-in-possession's fiduciary duties").

### D. Equitable Subordination.

Equitable subordination is provided for by 11 U.S.C.§510(c):

8

[A]fter notice and a hearing, the court may –

(1)    under principles of equitable subordination, subordinate for purpose of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2)    order that any lien securing such a subordinated claim be transferred to the estate.

See *In re Hedged-Investments Associates, Inc.*, 380 F.3rd 1292 (10th Cir. 2004):

"In *United States v Noland,* [517 U.S. 535, 539 (1996 )] the Supreme Court held that Congress's failure to include specific criteria for equitable subordination in the language of the statute, and the provision's reference to "principles of equitable subordination," "clearly indicates congressional intent at least to start with existing doctrine" that had developed prior to the statute's revision in 1978. … [T]he Fifth Circuit announced what has now become the standard formulation of the common law of equitable subordination. … *In re Mobile Steel*, [563 F.2nd 692, 699-700 (5th Cir. 1977)] recognized by the *Noland* Court as the leading Circuit case on the subject, listed three requirements that must be met for a court to exercise its equitable subordination power: (1) "inequitable conduct" on the part of the claimant sought to be subordinated; (2) injury to the other creditors of the bankrupt or unfair advantage for the claimant resulting from the claimant's conduct; and (3) consistency with the provisions of the Bankruptcy Code. … .

Our Circuit adopted the *Mobile Steel* standard in *In re Castletons, Inc.* [990 F.2d 551, 559 (10th Cir. 1993)], placing special emphasis on the inequitable conduct prong: "*The critical inquiry* is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated." … (emphasis added).

Further,

"'Inequitable conduct' for subordination purposes encompasses three categories of misconduct: (1) fraud, illegality, and <u>breach of fiduciary duties</u>; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego. [citing] … *In re Fabricators*, 926 F.2d 1458, 1467 (5th Cir. 1991) interpreting the *Mobile Steel* standard …

When examining a transaction for evidence of inequitable conduct, this Circuit has joined other[s] … in applying different levels of scrutiny to insiders and non-insiders of the debtor corporation. *See In re Castletons*, 990 F.2d at 559. <u>Where the claimant is an insider or a fiduciary, the party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider.</u>"

9

*Id.* 380 F.3d at 1301 (emphasis added).

*Mobile Steel* also holds that "…inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim." 563 F.2d at 700, citing *In re Kansas City Journal-Post Co.*, 144 F.2d 791 (8th Cir. 1944) (…"[t]he inequity which will entitle a bankruptcy court to regulate the distribution to a creditor … need not therefore be specifically related to the creditor's claim …" ). See also *Matter of Lemco Gypsum, Inc.*, 911 F.2d 1553, 1556 (11th Cir. 1990) (same); *In re Winstar Communications, Inc.*, 554 F.3d 382, 412 (3rd Cir. 2009) (same) (Delaware).

And, when dealing with claimants who are insiders or fiduciaries

> "the trustee bears the burden of presenting material evidence of unfair conduct … [that] the [insider] claimant then must [rebut by proving] the fairness of his transactions with the debtor." *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir. 1986).

*Winstar Communications*, 554 F.3d at 412 (emphasis added). See also 4 Collier on Bankruptcy ¶510.05[3][d], p. 510-23, 16th Rev. Ed. (2017):

> In *Pepper v Litton*, [308 U.S. 295 (1938)] the Supreme Court, laying the groundwork for the doctrine of equitable subordination now codified at section 510(c ), stated that the dealings of a controlling stockholder are subject to rigorous scrutiny and that when such dealings are challenged the burden is on the stockholder to show not only good faith but the inherent fairness of the transaction. Thus, where there is no requirement [ per se] that the claims of officers, directors, or shareholders be subordinated, once the trustee has presented material evidence of unfair conduct, such insiders have the burden of showing the fairness of their transactions with the debtor. (emphasis added)

**2.** **Gordian's Claim Should be Equitably Subordinated.**

**A.** **Inequitable conduct and breach of fiduciary duty in purchase of the CBT notes and security from ESL.**

10

The very filing of the bankruptcies was based on Modell's fear that the CBT notes and security, as held by ESL, would be foreclosed.  (G.Ex. N, 69).  Upon filing, the Debtors took positions contesting the amount of the CBT/ESL debt (Trustee's Statement of Uncontroverted Facts, ¶s 19, 21).  Even while contesting the amount of debt, the Debtors negotiated with ESL for a discount, in order to make a Plan more feasible. (T.Ex. 25).

Modell then discovered that the CBT/ESL notes could be purchased at a discount (G.E. N, 74-75).  Instead of disclosing this to the Court and the Committee, Modell "saw an opportunity" and told Gordian "we should be buying this" (G.Ex. N, 149).

Gordian then purchased all the CBT/LPAI notes and security, including the guarantees, and the "Charge" against the IP granted by Lister Petter Green Technologies.  The purchase price was $450,000, with $282,000 of this amount being paid directly to CBT to complete the ESL purchase (T.Ex. 13, 3-4). (G.Ex. N, 104-106).  Modell then instructed Mr. Nazar to convert the bankruptcy cases to Chapter 7 "so that Gordian could foreclose its security interest" and "eliminate the standing of the Creditor's Committee to raise issues." (T.Ex. 22).

In *Citicorp Venture v Committee of Creditors Holdings*, 160 F.3d 982 (3rd Cir. 1988), the Court, citing *Brown v Presbyterian Ministries,* 484 F.2d 998, 1005 (3rd Cir. 1973), held that the opportunity to purchase notes at a discount of a Chapter 11 debtor is a corporate opportunity, and " …a director of a corporation in bankruptcy owes a fiduciary duty to creditors and cannot seize [such] a corporate opportunity without disclosure to the creditors or their representatives."  168 F.3d at 988[4].  Further, such fiduciary duty "required that [the director and his other company]

---

[4] In *Citicorp*, Citicorp Venture Capital (CVC) held 28% of the equity in Papercraft Corporation's parent, Amalgamated.  It also had a seat on Papercraft's board.  Papercraft encountered financial difficulties after a leveraged buyout, and a restructuring was negotiated.  Creditors were to be issued stock and bonds in a new company under Chapter 11.   The board, including CVC's representative approved, the Chapter 11 was filed, and a

share everything it knew … before commencing its purchases.  [F]ailure to do so would <u>alone</u>

support a subordination." <u>Id</u>. (emphasis added)  The Court held that …"[a]t a minimum, the

remedy here should <u>deprive CVC of its profit on the purchase</u> …by subordinating CVC's claim

under §510(c )… to limit its recovery to the purchase price of the notes."  160 F.3d at 991.

(emphasis added)

In the present case, it is clear that Modell breached his fiduciary duty to LPAI by failing

to disclose the corporate opportunity to purchase, at a discount, the CBT notes and security

agreements from ESL.  <u>And</u>, Gordian usurped that opportunity.  "At a minimum" this requires

subordination of Gordian's claim, under the CBT notes, to the Gordian purchase price:

$450,000.00.

Gordian argues, however, that it did not usurp a corporate opportunity by purchasing the

CBT notes, because LPAI was "not capable of taking advantage of the opportunity."[5]  Gordian

Brief, p. 30.  This same argument was rejected in *Citicorp*:

"The absence of a disclosure in circumstances of this kind makes it
extremely difficult to say with confidence what would have happened had

---

Committee appointed.  CVC then went about purchasing existing debt (notes) from creditors and obtained 40.8%,
CVC then proposed its own Plan, which provided for CVC to purchase Papercraft's assets.  The committee objected
to CVC's claims (asserting the purchased notes) and sought equitable subordination.  CVC's Plan was withdrawn
but it objected to the pre-packaged Plan.  The bankruptcy court confirmed the Plan and ordered equitable
subordination.  It limited CVC's recovery to the amount its paid for the notes, diluted further by the Plan's treatment
of those notes.  The district court affirmed in part, but allowed the full amount of the purchase price. not diluted.
The Court of Appeals affirmed the district court, and remanded.

[5] The cases cited by Gordian are distinguishable.  *In re Robustelli*, 430 B.R. 709 (Bankr.N.D.Ga 2010) involved a
family owned corporation run out of the house of the founder's son, who then left to start his own business using
corporation's telephone number and customer list.  Although the family corporation <u>had</u> a breach of fiduciary claim
for the value of the telephone number and customer list, it did not have an usupation claim where the founder made
no attempt to operate the business after the son left and was "semi retired."  In *Lake County Investments*, 2001 WL
267475 (Bankr.D.Idaho March 19, 2001) the LLC debtor was deadlocked, and under the facts and the Court's view
of Idaho law there was no fiduciary duty between the members.  <u>And</u>  there was full  disclosure, <u>Id</u> *10.  In *Rajala v
Gardner*, 2012 WL 1189773 (D.Kan. April 9, 2012)  *aff'd* 709 F.3d 1031 (10th Cir. 2013) the operating agreement
of LLC allowed individual members "to take opportunities for themselves" and therefore there was no breach of
fiduciary duty <u>Id</u>  *18.

no breach of duty occurred and that, in itself, is a compelling reason for insisting on disclosure."

160 F.3d at 988.  And,

> "If the attention of the [Debtor's] board and the Committee had been focused on the potential CVC perceived in its note purchases, it is not at all clear that [the Debtor] or its creditors would have been unable to tap additional resources, just as CVC did.  Either or both might have been able to seize or participate in the opportunity through borrowing, court approved purchases or amendment of the plan of reorganization to include a cash-out option.  See, e.g., *In re Cumberland Farms, Inc.*, 181 B.R. 678 (Bankr.D.Mass. 1995)."

*Id*. n. 4 (emphasis added).  And see *In re Basil Street Partners, LLC*, 2012 WL 6101914 (Bankr.M.D.Fla Dec. 7, 2012) at *25.

It must be remembered that ESL needed only some $282,000.00 to clear its purchase from CBT.  Had Gordian refrained from the purchase, and disclosed the opportunity,  the Committee, at least, may well have been able to structure a borrowing or other favorable purchase.[6]  Notwithstanding Gordian's arguments about LPAI's financial condition, Gordian Brief, p. 30, the Debtors were negotiating (understandably with Modell's knowledge) as of April 13, 2015 (the §341 hearing date) to settle with ESL by paying even more (T.Ex. 25).  And, the financials were being reported as still favorable (T.Ex. 26, 27 and 28).

The CBT notes included, as part of the collateral, not just the LPAI assets but other Lister Petter intellectual property under the "Charge Over Intellectual Property" from guarantor Lister Petter Green Technologies Limited (G.Ex K).  And see T. Ex. 23.   We do not know for sure why Gordian paid $450,000 for the CBT notes, instead of the $282,000 left owing to CBT by ESL.

---

[6] And, what would have happened had ESL defaulted and the notes "went back" to CBT?  Having received all but the $282,000, would or could CBT have enforced the full $2,048,000 against LPAI?  It is likely that even if CBT attempted to do so, the Court would have limited its claim to the $282,000, as it had been otherwise paid.

13

However, we do know that Gordian and Modell were very interested in the IP and that Modell now stands to profit handsomely from it. See Part B ii, below. This points to an increased possibility that ESL would have parted with the CBT notes (at least as to the LPAI assets) for no more than the $282,000, particularly if the IP were excluded from the sale.

These facts, and the clear breach of fiduciary duty in failing to disclose the purchase opportunity to the Committee or the Court, are "material evidence of unfair conduct" which requires Gordian to prove the "fairness" of its actions. Gordian has failed to do so, and will not be able to.

**B        Further Subordination**

*Citicorp* also states:

> [F]urther subordination may be appropriate, …[W]e do not suggest that a bankruptcy court can never impose a subordination remedy beyond disgorgement of profit without putting a specific price tag on the loss suffered by those who will benefit from the subordination. Such quantification may not always be feasible, and where that is the case, it should not redound to the benefit of a wrongdoer. A bankruptcy court should, however, attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination.

110 F.3d at 991 (emphasis added). The Court noted that further subordination might be found in that "… there is evidence which would support a finding that [other] creditors suffered injury from CVC's attempt [through the note purchase] to control the reorganization." 160 F.3d at 991-92 (emphasis added). See also *In re Winstar Communications, Inc.*, 554 F.3d 382, 413-414 (3rd Cir. 2009) (following *Citicorp*, "…although this court has indicated that a creditor's claim should only be subordinated to the extent necessary to remedy the harm caused by the creditor's

misconduct, we have never required the bankruptcy estate to quantify specific harms to the estate or other creditors.  Indeed the key question … is whether the bankruptcy court's findings demonstrate the 'proportionality of the remedy to the injury'").

"Further subordination" is <u>clearly</u> appropriate in this case.

**(i)**    **Control of the Reorganization.**  It is telling that when the case was filed Modell had the Debtor take positions that the CBT/ESL debt was only $304,000 instead of the face value of $2 million (T.Ex. 18) and that the litigation to pursue D'Aubigney and/or ESL was pushed (T.Ex. 19).

However, as soon as Gordian purchased the CBT/ESL notes and security, Modell wanted the debt recognized at the full face amount, and instructed Nazar to convert the cases to Chapter 7 "…so that Gordian Trading could foreclose its security interest …[and] eliminate the standing of the Creditors Committee to raise issues."  (T.Ex. 22, 1-2).  The case would therefore go from one where 100% payment to creditors was projected, to where creditors would receive nothing and Gordian would take all LPAI's assets.

Rather than use the purchase to simply control the Chapter 11 reorganization (bad enough), Gordian wanted to destroy the reorganization and take all the assets for itself.  It still does.  Again, because of the non-disclosure and usurpation we cannot say with confidence whether a Plan could have been structured that would have benefited creditors other than Gordian.  Control of that process was taken by Gordian for its or Modell's personal benefit.

This is compelling evidence of additional breach of fiduciary duty by Modell "redounding" to the benefit of Gordian.  Again, the burden of proof is now on Gordian to prove the "inherent fairness" of its and Modell's actions.  It cannot do so.

**(ii)** **The IP Collateral.**  As soon as Modell arrived on the scene at LPAI there was a dispute over the ownership of the Lister Petter IP.  Modell, and one of his other companies, Dorset Road 1 (DR-1) had purchased the assets of Lister Petter Limited (LPLtd) from the Liquidator (G.Ex. N, 50-53; T.Ex. 4).  Then, Gordian purchased the <u>shares</u> of LPLtd from the Liquidator (G.Ex. 5).

Modell wanted to manufacture and sell Lister Petter branded products.  In fact, that led to Gordian also buying RALOI, so that Modell could obtain more manufacturing capacity. However, the IP (trademarks, patents, registered designs) had been assigned by LPLtd to Lister Petter Green Technologies Limited (LPGT) (G.Ex. LL) <u>before</u> the LPLtd insolvency proceeding and LPGT had granted a lien to CBT to secure its guarantee for of the LPAI debt ("Charge Over Intellectual Property") (T.Ex. 23).

Modell made a point of telling CBT that he was challenging the validity of the LPLtd assignment to LPGT (T.Ex. 7).  However, he also needed the LPAI facility to manufacture for DR-1.  He therefore offered to recognize the validity of the assignment and CBT's lien, in exchange for continued forbearance to LPAI (*Id*)  However, this became more challenging when ESL bought the CBT note and security, <u>including</u> the LPGT "Charge" over the IP.  In fact, ESL's attorneys prepared a letter directed to LPGT saying ESL would collect the CBT loan and appoint a receiver to take control of the IP under the "Charge" (G.Ex. GG).  This could clearly impact more than LPAI, possibly including all hope to control other manufacturing of Lister Petter products (including in the UK).

Even as LPAI's attorney, Mr. Nazar, was negotiating with ESL's attorney for a discounted amount to the CBT debt, so as to aid the Debtors' reorganization, Modell learned that the entire CBT debt and security could be purchased.  With no disclosure, he had Gordian buy

16

the debt and security for $450,000 which was more than the $282,000 ESL needed to complete its purchase amount owing to CBT.

In addition to instructing Mr. Nazar to convert the cases to Chapter 7 so that Gordian could foreclose against LPAI, on May 18, 2015 (shortly after the Gordian-ESL purchase on April 24, 2015) Gordian made an additional purchase from the LPLtd Liquidator of IP (including any that might be recovered from LPGT) (T.Ex. 24). With this, Gordian now controlled "both sides" of the IP issue. To add insult to injury, Gordian then demanded that LPAI "cease and desist" using the IP (trademark, etc.) (T.Ex. 29). This further shows Gordian's strategy to "kill" the Debtors for purposes of its own gain.

And, we now know that Gordian immediately transferred the IP to Modell Enterprises, which has pending a sale of the IP for 7 million pounds (G.Ex. N, 153) (T.Ex. 17).

Of course, Gordian and Modell gained control of "both sides" of the IP issue only by purchasing the CBT notes and security from ESL through a breach of fiduciary duty to LPAI. Had Gordian and Modell disclosed the opportunity to purchase the notes and security, and helped LPAI purchase the same, or at least refrained from competing, LPAI and its creditors might well have been in a position to leverage a payment that would have allowed LPAI to go forward with its Chapter 11 with no secured debt.

Again, the burden should be on Gordian to show how this is "fair" to LPAI. A remedy of complete subordination is certainly "proportional" to the injury sustained by LPAI and its creditors, as to the IP collateral issue alone.

**(iii)** **The D'Aubigney Release.** The ESL purchase also included a "release" of D'Aubigney (T.Ex. 13-4 ¶3.1.2, and 13-12). Granted, the release was as to D'Aubigney's <u>guarantee</u> of the CBT notes, but that is probably broad enough to cover any claims growing out

17

of the purported "inflated" borrowing from CBT of which Modell had so vehemently

complained. See e.g. T.Ex. 7; T.Ex. 21. The release, of course, was also not disclosed. This

certainly harmed, even if it did not foreclose, any residual claim LPAI and its creditors might

have against D'Aubigney. Again, Gordian should have the burden to show how the release was

fair to LPAI and its creditors. It has not made such a showing. This should add to the scale as

part of the "proportionality" of harm requiring complete subordination of the Gordian claim.

**(iv)**     **The Dorset Road (DR-1) AR.**

Gordian and Modell's involvement with LPAI came about because Dorset Road 1 (DR-

1), owned by Modell, needed LPAI to help manufacture Lister Petter engines and complete a

large Dorset Road contract (G.Ex. N, 52). After Modell took control of LPAI, DR-1 became,

effectually, its only customer. Outside orders were directed through DR-1 (T.Ex. 6, 89).

There appears to be at least two sets of product LPAI shipped to DR-1. The first was just

parts. When Briggs arrived (slightly before Modell) he found the inventory too high and

decided inventory had to be sold to raise cash (T.Ex. 6-106). The $1.5 million A/R to DR-1 did

not include any finished goods, or parts manufactured by LPAI (T.Ex. 6-60). This A/R "arose"

at the <u>latest</u> "in early to mid-March" 2015, and there was an "element" of it that arose before that

(T.Ex. 6-101). There was also a <u>second</u> set of <u>finished</u> product "dispatched" to DR-1. As of the

<u>June 15, 2015</u> hearing on the Motion to Appoint Trustee, such product had "not yet been

received by" DR-1 (T.Ex. 87-88).

The quality issue relied on by Gordian and Modell could only have applied to the non-

finished goods parts shipped no later than mid-March 2015. There were a "variety of items, …

pistons without rings, …fuel injectors, … flywheel housings and radiators" (T.Ex. 6-60). The

DR-1 "<u>Sample</u> Appraisal Report" is dated 5/14/15 (G.Ex. Y) relates to flywheels. Another

18

Sample Appraisal Report related to radiators (T.Ex. 6-61).  Obviously, these <u>sample</u> reports are exactly that, samples as to some of the parts inventory shipped to DR-1 no later than 3/15/15. The second set, the <u>finished product</u>, which was still in transit as of 6/15/15.  This second set could not be included in the "Sample Appraisal Report' rejects, as the Reports were created at least a month before that date.

In fact, the Trustee was able to obtain <u>some</u>  DR-1 invoices, which are set out as T.Ex. 16.  Several invoices are dated after 3/15/15, with in excess of $300,000 after that date.

This shows that the question of whether DR-1, in fact owes any sum to LPAI is far from settled (in any event as "no").  In turn, this also reinforces that the Modells and Gordian have otherwise acted inequitably to LPAI and its creditors, so as to require subordination even beyond the harm caused by non-disclosure of the ESL purchase opportunity.  Such apparent inequity (total non-payment) through the DR-1 arrangement calls for Gordian and Modell to carry the burden of showing fairness.

Gordian makes much of Scott Patton's deposition as to the "defective" product.  First, both the Trustee and the Committee counsel clearly recall Mr. Patton saying that the DR-1 AR was good.  (Declaration of Matthew McClintock) (Declaration of J. Michael Morris).  Second, it appears that Mr. Patton's testimony about some of the product <u>not</u> being "good" related to parts shipped in 2013 or 2014 (G.Ex. II, 66) which would not include the "missing" finished goods shipped in 2015.

     **3.**    <u>**Gordian's Claim May Also be Subordinated Based on the Conduct of Its Assignor (ESL)**</u>.

Gordian did <u>not</u> take an assignment from CBT.  Rather, it took its assignment from ESL, which is/was controlled by Robert D'Aubigney.  Modell repeatedly spelled out his charges against D'Aubigney, when it was in his interest to do so.  E.g. T.Ex. 7.

The general rule is that an assignee takes subject to <u>all equities and defenses</u> existing <u>between the assignor and the debtor</u> prior to notice of the assignment.  See e.g. *Guaranty Na.Ins.Co. v McGuire*, 192 F.Supp.2d 1204 (D.Kan.2002) (applying Kansas law), and *Lipari v U.S. Bankcorp N.A.*, 524 F.Supp.2d 1327 (D.Kan.2007) (applying Missouri law) (the CBT loans are governed by Missouri law).  According to Modell, ESL bought the CBT note and security "to hide fraud which had been committed by ***raisi[ng] sales invoices to Lister-Petter Americas for goods which were never shipped" (G.Ex. 122, 124), and then using the invoices to borrow money from CBT.  Gordian clearly knew this when it bought the notes from ESL.

Gordian argues that it should be considered to be standing only in the shoes of CBT and not ESL, but offers no case law in support.  It posits that "Gordian cannot be responsible for ESL's or D'Aubigney's actions arising outside of the CBT Loan," Gordian Brief, 27.  However, D'Aubigney's wrongful actions <u>do</u> "arise" as part of the CBT loan.

Of course, this issue does not need to be addressed if Gordian and Modell's own actions are sufficient to find equitable subordination, as set out above.

### 4.    <u>Turnover is Not at Issue</u>.

The Amended Complaint includes a Count for Turnover, Count III (Adv.Dkt. #4, p 5).  However, the Trustee will abandon any claim against Gordian under this Count, insofar as it seeks turnover.  Turnover is implicated under §542(b) ("… an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee …").  So limited, turnover implicates DR-1 and the

20

Modells as to the DR-1 invoices (see discussion above).  The Modells are defendants but not parties to the Summary Judgment Motion and the matter is, therefore, not at issue in the Motion.

Count III is still viable, however, against both Gordian and the Modells for breach of fiduciary duty.  What has been said above under the discussion of equitable subordination should apply here as well.

### 5. Marshalling Is Not At Issue.

The Amended Complaint includes a Court for "Objection to Claim and Request for Determination of Amount of Same and/or for Marshalling", Count IV (Adv. Dkt. #4, p 6).  The Trustee will abandon any claim as to marshalling, which was related to the IP part of the purchased CBT loans.  However, such abandonment does <u>not</u> include the arguments as to the IP set out above under equitable subordination, which effectively sub-sume the marshalling argument.

Count IV is still viable as to the balance of the allegations.

### 6. Fraudulent Obligation Remains at Issue.

The Amended Complaint includes Count V for "Avoidance of Fraudulent Obligation" (Adv. Dkt. #4, p 7).  Although this Count does not make allegations of fraud against Gordian, it does allege fraud in the CBT loan, under which Gordian makes its claim.  These allegations are, again, the same allegations Modell repeatedly made against D'Aubigney as to the CBT loan. See Part 3 above.  Gordian makes no argument to the contrary.

### 7. Trustee's Additional Costs.

Gordian argues the Trustee is not entitled under §506(c) to costs, to be assessed against the proceeds of the sale of LPAI's assets, for e.g. preparation of tax returns.  This issue will only have to be addressed if the Court does not subordinate Gordian's claim.  Here, the <u>only</u> "income"

21

the estate has which will require returns, is/are the proceeds of the sale. Gordian impliedly consented to that sale and should not be heard to complain of an expense which arises directly from the sale. If Gordian is somehow found to be fully secured in all the proceeds, it should be subject to such costs. See e.g. *In re Tollenaar Holsteins*, 538 B.R. 830 (Bankr.E.D.Cal. 2015).

**8.** **Gordian Is Not Entitled to Sanctions.**

What has been set out above clearly shows that Gordian's request for sanctions has no merit.

**Conclusion**.

Modell and Gordian's self-dealing and conflicts of interest as to the Debtors is pervasive in this case. Both are insiders. With the evidence presented, Gordian has the burden to prove the fairness of its claim. Gordian has not met that burden. Ample grounds exist for equitable subordination of Gordian's claim under §510(c), with transfer of the lien to the estate. The summary judgment motion should clearly be denied.

KLENDA AUSTERMAN LLC
301 North Main, Suite 1600
Wichita, Kansas 67202
(316) 267-0331 telephone
(316) 267-0315 facsimile
jmmorris@klendalaw.com

By:___*s/ J. Michael Morris*_____
　　　J. Michael Morris #09292
　　　Attorney for Trustee

22

## CERTIFICATE OF SERVICE

       I hereby certify that on April 25, 2017, the foregoing Response was electronically filed with the Clerk of the U.S. Bankruptcy Court by using the CM/ECF system and the same was provided by a notice of electronic filing and/or U.S. Mail to the following:

Vincent Filardo, Jr.
Mishcon de Reya New York LLP
750 Seventh Avenue, Floor 26
New York, New York 10019

James E. Bird
Polsinelli, PC
900 W. 48th Place, Suite 900
Kansas City, Missouri 64112

                               *s/ Kandance R. Sharp*
                               Kandance R. Sharp

23