**SO ORDERED.**

**SIGNED this 21st day of September, 2018.**



_____
Robert E. Nugent
United States Bankruptcy Judge

_____

**DESIGNATED FOR ONLINE PUBLICATION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE:<br><br>LISTER-PETTER AMERICAS, INC.<br>      Debtor. | Case No. 15-10502<br>Chapter 7 |
| IN RE:<br><br>J. MICHAEL MORRIS, Trustee<br><br>     Plaintiff,<br><br>vs.<br><br>GORDIAN TRADING LTD UK;<br>TREVOR R. MODELL; and<br>DEVON M MODELL,<br><br>    Defendants. | Adv. No. 17-5030 |

**ORDER ON GORDIAN TRADING LTD UK's
MOTION FOR SUMMARY JUDGMENT and
<u>MOTION TO STRIKE DECLARATIONS</u>**

1

The chapter 7 trustee J. Michael Morris sold and liquidated the tangible assets of Lister-Petter Americas, Inc. (LPAI) and deposited sale proceeds of some $688,000 in the Court's registry. Gordian Trading Ltd. UK (Gordian) is the principal secured creditor of LPAI with an alleged claim of $2.048 million, having acquired the loan of LPAI's former lender from the lender's assignee, Embracing Solutions Limited (ESL) for $450,000, a few weeks after LPAI filed for chapter 11 bankruptcy relief. At the time of Gordian's acquisition of the loan, defendants Trevor and Devon Modell were directors of both LPAI and Gordian, and Trevor Modell had given prepetition a $950,000 limited guaranty of LPAI's indebtedness.

The chapter 7 trustee seeks: (1) to equitably subordinate the secured claim of Gordian under 11 U.S.C. § 510(c); (2) to disallow or limit Gordian's claim under § 502(b); (3) turnover of $1.5 million owed by Trevor Modell's company Dorset Road 1 for parts supplied by debtor; (4) an award of damages resulting from the individual Modell defendants' breach of fiduciary duties owed to the bankruptcy estate and unsecured creditors; and (5) an award of costs and expenses under § 506(c).[1] Following four months of discovery that ended in December 2017,[2] Gordian moves for summary judgment on the claims asserted against it.[3] Gordian has also filed a motion to strike the declarations of J. Michael Morris and Matthew McClintock submitted in

---

[1] *See* Final Pretrial Order, Adv. Doc. 82. At the pretrial scheduling conference held on August 17, 2017, the Court consolidated the trustee's objection (Doc. 419) to Gordian's claim 54, with the adversary proceeding for purposes of discovery and directed that the two matters would be tried together. Adv. Doc. 23.

[2] *See* Adv. Doc. 23. The discovery deadline was extended to January 17, 2018 to allow the trustee to depose a representative (William Dippel) of Citizens Bank and Trust Company. *See* Adv. Doc. 35.

[3] Adv. Doc. 44, 45-46.

2

support of the Trustee's memorandum in opposition to summary judgment.[4]  Both

motions have been fully briefed and carefully considered by the Court.[5]

I.    Findings of Uncontroverted Material Facts

LPAI filed a chapter 11 petition on March 17, 2015, along with its parent

company, Lister Petter U.S. Holdings, Inc. (LPUSH). According to the statement of

financial affairs filed April 1, 2015, LPAI is wholly owned by LPUSH, a holding

company. LPUSH is wholly owned by an entity named RA Lister Overseas

Investments Ltd UK (RALOI), which in turn is wholly owned by Gordian.[6] LPAI's

disclosure of parent corporations filed March 18, 2015 represents that LPAI's parent

company is LPUSH and the parent company of LPUSH is RALOI.[7] Both debtors are

Delaware corporations. LPAI manufactured small diesel engines and engine parts in

Olathe, Kansas. At the time of filing, Scott Patton was the manager of LPAI's day-to-

day operations, Phillip Briggs was the general manager, and Trevor Modell and his

son Devon Modell were directors of LPAI. Based upon testimony of Briggs and Trevor

Modell in prior hearings in this case, Robert D'Aubigny or his company Lister Petter

---

[4] Adv. Doc. 57, 58.
[5] The chapter 7 trustee, J. Michael Morris, appears in person and by his counsel Christopher A. McElgunn. Gordian Trading Limited appears by its attorneys Vincent Filardo, Jr. and James E. Bird. Pro se defendants Trevor and Devon Modell did not file a response to Gordian's summary judgment motion.
[6] Ex. 11. The statement of financial affairs was electronically signed by Trevor Modell but he did not indicate his position or title. *See* Case No. 15-10502, Doc. 67, p. 70, 74.
[7] Case No. 15-10502, Doc. 26.

3

FZE "ran" or operated LPAI until early 2015 when Trevor Modell "took over."[8] Trevor Modell described himself as an entrepreneur and consultant.

Prior to filing, LPAI's assets were encumbered by liens granted to its 2008 lender Citizens Bank and Trust Company (CBT) to secure repayment of a loan facility of about $2.048 million.[9] The original credit was further secured by a limited guaranty executed by Lister Petter Investment Holdings, Ltd, (LPIH), a British company.[10] Part of CBT's collateral package was an intellectual property charge granted in April, 2014 by Lister Petter Green Technologies (LPGT), a Guernsey, Channel Islands entity and LPAI affiliate, in all Lister Petter intellectual property as part of CBT's March 11, 2014 forbearance and modification agreement with respect to the LPAI credit.[11] The forbearance agreement was amended several times through December of 2014.[12] As discussed later, there is a question about whether LPGT legally owned the intellectual property when it made the charge, but there seems little doubt that the Lister Petter entities intended to make the charge.[13] As part of

---

[8] Ex. 6. Phillip Briggs was formerly employed by Lister Petter FZE, but resigned in February of 2015; Modell promptly hired him to consult on LPAI's operations. LPAI's statement of financial affairs reveals that at about the same time, Mike Shell, the president of LPAI, was terminated. *See* Case No. 15-10502, Doc. 67, p. 73

[9] The loan facility was a revolving line of credit originated in 2008 and was amended and restated several times over the years. *See* Ex. A.

[10] Ex. E. That guaranty was superseded and replaced by an unlimited continuing guaranty dated June 20, 2013 and LPIH subsequently consented to the forbearance agreement and reaffirmed its guaranty obligations. *See* Ex. B, pp. 2, 16. *See also* Ex. VV, p. 32 listing the 2013 guaranty among CBT's loan documents. The Court could not find the 2013 guaranty among the summary judgment exhibits.

[11] *See* Ex. B (Forbearance Agreement), ¶¶ 4(g) and (j), 10; Ex. K (Charge Over Intellectual Property).

[12] *See* Ex. VV, pp. 32-33/67.

[13] A second charge over intellectual property dated September 30, 2014 is among CBT's loan documents (Ex. VV, p. 33) and is part of Gordian's proof of claim (Ex. PP, pp. 163-184). It purports to supersede the April 2, 2014 charge (Ex. K).

4

the 2014 forbearance agreement, LPAI executed a $5.073 million short term note in favor of CBT[14] that was further secured by guarantees from the following Lister Petter entities and individuals: LPIH, Lister Petter FZE (LPFZE) (a United Arab Emirates company located in Dubai), RALOI, LPGT, Robert D'Aubigny, a principal of LPFZE, and Trevor Modell, an LPAI director.[15] All of the guarantors were listed as codebtors on Schedule H of the bankruptcy filings, except Trevor Modell.[16]

Two of LPAI's directors, Trevor and Devon Modell, were also directors of Gordian, along with James Winder, Gordian's sole shareholder.[17] Gordian was founded in 2012 and both Modells have been directors since 2014. Gordian was in the business of acquiring distressed companies.[18] The Modells did not own a direct interest in Gordian, but exercised control over LPAI and Gordian at the time of filing. Indeed, in correspondence on LPAI letterhead to CBT dated February 25, 2015, Trevor Modell identified himself as a director of LPAI and the CEO of Gordian and further represented that Gordian was the "umbrella company" of the Lister Petter trading companies.[19]

---

[14] Ex. C.

[15] Ex. E (LPIH), Ex. F (RALOI), Ex. G (LPFZE), Ex. H (LPGT), Ex. I (D'Aubigny), and Ex. J (Modell). The guaranties of RALOI, LPFZE, LPGT all recite that the guarantors are affiliates of LPAI. In executing a limited guaranty up to $950,000 of LPAI's term note, Modell represented and warranted that he "has a direct and substantial economic interest in Borrower [LPAI] and expects to derive substantial benefits therefrom and from any loans, credit transactions, financial accommodations, discounts, purchases of property and other transactions and events resulting in the creation of the Obligations guarantied hereby." Ex. J, ¶ 4.

[16] Case No. 15-10502, Doc. 67, p. 57.

[17] Ex. P (Gordian annual return dated September 5, 2016). Trevor was appointed a director of Gordian in January of 2014. Ex. Q. Prior to Trevor's appointment, Gordian's directors were Devon Modell and James Winder. Ex. O (Gordian annual return dated September 5, 2013).

[18] Ex. N.

[19] Ex. 7.

5

In late 2014 (while the Modells were Gordian directors), Gordian considered purchasing LPAI by purchasing shares of RALOI, from the British law liquidator of LPIH, Mr. Tyrone Courtman.[20] RALOI had an ownership interest in LPAI and was an asset of LPIH. The LPIH liquidator agreed to sell Gordian 10,000 shares of RALOI for £1.7 million. Gordian was to make a non-refundable deposit and make monthly payments. When the payments were complete, the parties would have three months to execute any other documents necessary to effectuate the deal. It appears that this share sale agreement was never fully executed, that Gordian never completed the payments for the RALOI shares, and the transfer of the shares never occurred because Courtman concluded that LPIH lacked legal title to the RALOI stock.[21] Another affiliated company, LPFZE, may have owned the RALOI stock under a prior transfer by LPIH.[22] LPFZE was owned or controlled by Robert D'Aubigny. The LPIH liquidator ultimately concluded that LPFZE did not perform that agreement and sought return of the shares. When the LPIH liquidator could not procure the return of the RALOI stock from D'Aubigny or LPFZE, the sale and transfer of the RALOI stock to Gordian was never consummated.[23]

---

[20] Ex. 5.

[21] *Id.* This share sale agreement dated "__ January 2015," is not executed by Gordian. The Court cannot find any other executed share sale agreement for the RALOI stock between Gordian and LPIH and Courtman in the summary judgment record. Gordian cites to Ex. S as the subject share sale agreement, but this agreement is for Gordian's purchase of Lister Petter Limited (LPL) shares from the LPIH liquidator.

[22] *See* Ex. Z. According to RALOI's annual report dated May 2014, LPIH apparently transferred the 10,000 RALOI shares to LPFZE in January 2013.

[23] *See* Gordian Uncontroverted Fact Nos. 14-16. *See also* Ex. R.

6

But during the first half of 2015, Trevor Modell took actions consistent with management or control of LPAI when it was in default under the CBT forbearance agreement. In February 2015, he sought to negotiate a new forbearance agreement with CBT on behalf of LPAI (while also holding himself out as the CEO of Gordian), and attempted to dissuade CBT from selling and assigning the loan to ESL.[24] LPAI was in default of a scheduled $1,500,000 payment due on February 25, 2015 under the forbearance agreement and on March 4, 2015 CBT's counsel made demand on LPAI for full payment.[25] Trevor Modell put LPAI into chapter 11 bankruptcy and electronically signed the LPAI bankruptcy petition, schedules, and statement of financial affairs.[26] He employed Phillip Briggs and a corporate resolution by LPAI authorized Briggs, as "General Manager," to appear, execute documents, and perform any and all acts on LPAI's behalf in the bankruptcy.[27] Moreover, Gordian funded some £250,000 to £300,000 of LPAI costs that included LPAI's filing fee, attorney fee retainer, and fronted wages and other operating expenses of the debtor in 2015.[28]

Gordian purportedly acquired another LPAI affiliate from the LPIH liquidator. On December 19, 2014, Gordian, LPIH, and Courtman entered into a share sale agreement for 500,000 shares of Lister Petter Limited (LPL) (another Lister Petter

---

[24] Ex. 7 (February 25, 2015 letter from Trevor Modell to William Dippel of CBT).
[25] Gordian Uncontroverted Fact No. 26. *See also* Ex. D.
[26] *See* Ex. V (LPAI's corporate resolution authorizing the bankruptcy filing). As noted previously, in the spring of 2014, Modell executed a limited guaranty of the LPAI indebtedness to CBT as part of the forbearance agreement. *See* Ex. J.
[27] Ex. V.
[28] Gordian Uncontroverted Fact No. 18. But the debtor's Fed. R. Bankr. P. 2016 disclosure filed in LPAI's bankruptcy states that RALOI paid a $100,000 retainer for the chapter 11 bankruptcies and a $10,000 consulting fee to debtor's counsel. *See* Doc. 38.

7

company in British bankruptcy, *i.e.* administration), held by LPIH as the registered shareholder, for £500,000.[29] Devon Modell executed this share sale agreement on behalf of Gordian.[30] As discussed below, LPL allegedly owned the Lister Petter intellectual property (IP).

In addition to LPFZE, D'Aubigny owned or controlled ESL. ESL entered the fray on March 3, 2015 when it purchased CBT's loan for a total purchase price of $2,048,022 (payable $1,764,946 by wire transfer in immediately available funds and a promissory note for the balance of the purchase price).[31] That purchase note was secured by D'Aubigny's guarantee and ESL's collateral assignment.[32] The loan purchase was a joint venture between D'Aubigny personally, ESL, and Anthony Jaffe, an ESL director. LPAI was in default under the CBT Forbearance Agreement at the time of ESL's purchase.[33] This transfer of CBT's loan to ESL did not reduce LPAI's indebtedness nor release it from the loan and security obligations.[34] On March 9 ESL made demand upon LPGT, as one of the CBT guarantors, for repayment of the loan and gave notice of its intent to exercise and enforce its rights under the intellectual property charge.[35] ESL intended to foreclose on the LPAI loan as a way of taking over

---

[29] Ex. S.
[30] The summary judgment record is silent whether that purchase was completed.
[31] Ex. CC (Loan Sale Agreement). The referenced note in the Loan Sale Agreement for the balance of the purchase price is absent from the summary judgment record.
[32] *See* Ex. FF and Ex. VV, pp. 61-67.
[33] Gordian Uncontroverted Fact No. 26.
[34] Gordian Uncontroverted Fact No. 27.
[35] Ex. GG.

8

LPAI and perhaps secure the IP for itself. This, in turn, placed the bankruptcy filings in motion.[36] So, at the petition date, March 17, 2015, ESL was LPAI's lender.

LPAI's road in reorganization was rocky and short. The Court entered first-day orders allowing LPAI to use ESL's cash collateral after representations that a full-payment plan could be proposed.[37] The initial cash collateral order was extended several times. LPAI also obtained debtor-in-possession financing of $200,000 from RALOI to address cash flow irregularities.[38] But on April 24, just five weeks after filing, ESL assigned all its interest in the CBT loan facility to Gordian for $450,000,[39] placing the Modells on at least two sides of the case: as directors for the debtor-in-possession and as directors of its lender. And it appears that Trevor Modell was still liable on the underlying CBT credit up to $950,000, stemming from his 2014 guaranty given in connection with the LPAI-CBT forbearance agreement, and thereby now indebted to Gordian.[40] The ESL-Gordian loan transfer involved a $450,000 cash payment by Gordian to ESL, part of which went to pay off ESL's promissory note to CBT for the balance of ESL's purchase of the CBT loan,[41] thereby effecting the release of ESL and D'Aubigny under his guarantees.[42]

---

[36] Ex. EE.

[37] Ex. HH.

[38] Case No. 15-10502, Doc. 11 (DIP Motion), Doc. 47 (Interim Order) and Doc. 78 (Final Order entered April 10, 2015). In the DIP motion LPAI represented that RALOI was a British corporation owned by Trevor Modell. It also represented that Gordian acquired RALOI in January 2015. In the interim and final orders granting the DIP financing, it is stated that RALOI is "owned by other British corporations controlled by Trevor Modell."

[39] *See* Ex. JJ.

[40] Ex. J.

[41] *See* Ex. JJ, pp. 2-12 (Sale Agreement). The payoff amount on ESL's purchase note was $282,016.64. *See* Ex. JJ, pp. 17- 18.

[42] *See* Ex. I (D'Aubigny's September 2014 guaranty of LPAI's term note given to CBT as part of CBT's forbearance and modification agreement) and Ex. FF (D'Aubigny's guaranty of ESL's

9

In LPAI's schedules and statements of affairs, prepared with the assistance of Briggs and electronically executed by Trevor Modell, ESL's claim (now Gordian's) is scheduled as "disputed" in the amount of $304,000 notwithstanding the face amount of its claim being over $2 million.[43] This is LPAI's only secured debt. Debtor's counsel Edward J. Nazar testified at the stay relief hearing that he assumed that some portion of the proceeds of liquidated securities used by D'Aubigny to acquire the loan facility for ESL had been applied to the CBT loan. Later evidence contravenes that statement, however, as CBT's witness testified no part of the conveyed debt had been reduced. In short, Gordian paid $450,000 for the $2.048 million loan facility that ESL bought just weeks before for $1.764 million cash and an alleged term note for the balance of some $282,000. Trevor Modell signed Gordian's proof of claim on July 9, 2015 in the amount $2,048,022.57, to which the Trustee objected.[44]

By late April of 2015, LPAI's bankruptcy had begun to go south. The unsecured creditors committee (Committee) became more active. And, Gordian, LPAI's new lender, became impatient. Trevor Modell pressed Debtor LPAI's counsel Edward Nazar to move to convert the case to chapter 7 liquidation so Gordian could enforce its security interests in LPAI's assets and eliminate the standing of the Committee

---

purchase note dated March 3, 2015 given to CBT as part of the sale of the CBT loan to ESL). While unclear, D'Aubigny's September 2014 guaranty appears to have been replaced by a December 2014 guaranty (and subordination agreement) referenced in CBT's loan documents at Ex. VV, p. 33. See Ex. JJ, pp. 13-14, 20-23 for the purported releases by Gordian (executed by Trevor Modell) and CBT respectively, of those guarantees. The December 2014 guaranty is absent from the summary judgment record.

[43] Doc. 67, Schedule D; ESL's claim is similarly shown on the list of 20 largest unsecured creditors.

[44] Claim 54-1; Doc. 419.

10

"to raise issues."[45] He also wanted LPAI to change and acknowledge the amount of the ESL debt (now assigned to Gordian) previously scheduled at $304,000 and disputed, to be at least $2.048 million.[46] At the last cash collateral hearing in the case, held May 28, 2015, the parties agreed to a 60-day extension of the cash collateral order with the Committee to present an agreed order memorializing the arrangement. That order was never submitted or entered. Instead, in June 2015, the Court granted the Committee's expedited motion to appoint a chapter 11 trustee in the case.[47] The Modells resigned as directors of LPAI and LPUSH.[48] The appointed trustee, J. Michael Morris, then acted to sell the tangible assets of the company free and clear of liens, a sale that the Court approved September 21, 2015.[49] After the asset sales were completed, the case was converted to chapter 7 on December 14, 2015, and Mr. Morris continued to serve in his capacity as the chapter 7 trustee.

Gordian moved for relief from the automatic stay for cause in August 2016, and following a period of discovery, the Court held a two-day evidentiary hearing commencing February 28, 2017.[50] The Court concluded that Gordian's interest in the sale proceeds was adequately protected by investment of the funds in the Court's interest bearing Court Registry Investment System fund, directed that the funds be so deposited, and denied Gordian's motion for relief from the stay.[51] The proceeds

---

[45] Ex. 22 (Letter from debtor counsel Ed Nazar regarding April 30, 2015 conference call).
[46] *Id.*
[47] Doc. 161 and 185. Ex. 6 (Tr. of June 16, 2015 Hearing).
[48] Ex. 15.
[49] Ex. QQ.
[50] Doc. 377. Ex. N and Ex. W.
[51] Doc. 435.

11

from the trustee's sale of tangible personal property remain on deposit in the Court's registry subject to the Court's determining this adversary proceeding and the Trustee's objection to Gordian's claim.[52]

Intangible assets also play a role in this case. On January 6, 2014, LPL purportedly assigned intellectual property rights for £554,090 and sold tooling for £225,212 to LPGT.[53] The assignment recites that LPL and LPGT are "under common control." The purported assignment is not executed by LPL.[54] When LPL subsequently went into British liquidation, its liquidator, Mr. Neil Money, concluded that LPGT had never paid for the property and the assignment was ineffectual.[55] Recall that CBT took the charge over the IP as collateral in support of a forbearance agreement with LPAI in April 2014, less than one year before the bankruptcies were filed here.[56] This IP charge was superseded by a new agreement dated September 30, 2014.[57] Both charges were purportedly granted by LPGT.

On May 18, 2015, two months after LPAI filed its bankruptcy case and shortly after Gordian acquired the CBT loan from ESL, Mr. Money sold the LPL intellectual property (IP) to Gordian (while the Modells were directors of both Gordian and LPAI);

---

[52] The amount of $688,888.58 was deposited on March 15, 2017. *See* Doc 429 and Receipt of Registry Funds. An order granting the deposit of additional funds was entered April 26, 2017. Doc. 438 and Receipt of Registry Funds on June 12, 2017.
[53] Ex. LL.
[54] *Id*. at p. 10.
[55] Ex. L. Ex. MM recites that LPL entered British administration on March 28, 2014 with Mr. Money acting as the administrator. LPL was then placed into creditors' voluntary liquidation effective April 8, 2015 and Mr. Money was appointed the liquidator of LPL.
[56] Ex. K.
[57] Ex. PP, pp. 163-84.

12

Modell Enterprises acquired the tooling.[58] According to Mr. Money, Gordian ultimately paid £110,000 for the IP.[59] It is assumed, but not clear, that this is IP that LPAI used in its operations. LPAI never licensed the IP, nor did it pay royalties for it. When Modell was negotiating with CBT before ESL bought the credit facility, he raised LPGT's questionable title to the IP in an effort to challenge CBT's secured position in it.[60] The only real suggestion that LPAI used the IP is found in a letter from Nazar to Phillip Briggs dated June 3, 2015, stating that Briggs had asked Gordian's counsel Tim McCarthy to make a demand concerning "Dorset Road Americas Inc.'s" unauthorized use of the IP, and referring to a license agreement that LPAI never executed but indicating that LPAI may have had "permissive use" of the IP.[61] By the time of the IP sale to Gordian, Gordian had already acquired the LPL stock from the LPIH liquidator.[62] And Mr. Money had previously sold the LPL plant, equipment, and fixtures to Dorset Road 1 (DR1) in April of 2014 for £350,000.[63]

LPAI engaged in substantial business with DR1, a company owned by Trevor Modell and EGL Engineering Ltd., a holding company which was also owned by Trevor Modell.[64] Gordian held no equity interest in DR1. Briggs characterized LPAI

---

[58] *See* Ex. MM. The Court notes that the subject assignment is not signed by Gordian. *See also* Ex. 24, Ex. 17.
[59] Ex. L.
[60] Ex. 7.
[61] Ex. 29. Dorset Road Americas Inc.'s relationship, if any, to Trevor Modell's company, DR1, or LPAI is not apparent from the summary judgment record.
[62] *See* pp. 7-8, *supra. See also* Ex. S (Share Sale Agreement dated December 19, 2014).
[63] *See* Ex. 4, Money's Progress Report as Administrator of LPL dated March 24, 2015, pp. 4-5. Mr. Money disclosed that this asset sale was made to a connected party DR1, "a company connected in that a former employee of the Company [LPL] is a director of DR1." Payments under the sale agreement were completed at the end of February 2015.
[64] Gordian Uncontroverted Fact No. 20. *See* Ex. X.

13

as a subcontractor for DR1 and stated that by the time of LPAI's bankruptcy, LPAI had no other customers or sales staff to generate purchase orders.[65] DR1 had a $9-$10 million contract to build motors for a Vietnamese company and needed engine parts that LPAI could supposedly source. In March 2015, after LPAI filed bankruptcy, LPAI shipped the parts to DR1 in the United Kingdom at DR1's expense (some £100,000) -- parts that DR1 then rejected as non-conforming. DR1 allegedly owes LPAI $1.520 million for the parts and is LPAI's largest account debtor, but denies that debt based on the parts' failure to comply with specifications.[66] We'll never know about that, however, because when LPAI was unable or unwilling to pay for their return to the United States, DR1 destroyed them. DR1 says that the failed parts deal caused it to lose the Vietnamese deal, driving DR1 into a United Kingdom bankruptcy proceeding. The summary judgment record with respect to DR1 is less than clear though, because at about the same time, Briggs indicated that LPAI separately shipped parts inventory to DR1 to generate cash. Thus, it isn't clear which parts were paid for, if any, by DR1 and which shipments comprise the DR1 receivable.[67] Nor does the summary judgment record indicate the date that DR1 entered British administration or liquidation as it relates to the above transactions with LPAI. Finally, in late April 2015, shortly after Gordian acquired the ESL debt, Trevor Modell disclosed that DR1 "might cease business activity with LPAI, thus creating a cash flow problem" for LPAI.[68] The uncontroverted facts suggest that Trevor Modell,

---

[65] Ex. 6.
[66] *See* Doc. 67, Schedule B, line 16.
[67] *See* Ex. 16.
[68] Ex. 22.

14

being in control of both entities, would have had intimate knowledge of their respective financial situations.

II.    Analysis

Gordian seeks summary judgment on the claims asserted against it: (1) § 510(c) equitable subordination of Gordian's claim; (2) § 502(b) disallowance or limiting Gordian's claim; and (3) surcharge of costs and expenses under § 506(c). After Gordian filed this motion, the Court settled the final pretrial order that controls further proceedings in this case. As that order reflects, the Trustee has abandoned a fraudulent transfer count that he had previously pleaded against Gordian. The individual Modells have not moved for summary judgment on the counts aimed at them: (1) damages for breach of fiduciary duty; and (2) turnover of the $1.5 million DR1 receivable. This order, therefore, resolves Gordian's motion as it concerns the counts for equitable subordination, disallowance or limiting of Gordian's claim, and surcharge.

### A.  Equitable Subordination, § 510(c)

The Trustee seeks to equitably subordinate Gordian's secured claim to the sale proceeds from LPAI's tangible assets. Section 510(c) authorizes subordination "for purposes of distribution[,] all or part of an allowed claim to all or part of another allowed claim" or transferring the lien that secures a subordinated claim to the bankruptcy estate.[69]  Based upon issues listed in the final pretrial order and the Trustee's complaint, it appears the Trustee invokes the latter relief.[70] However, he

---

[69] 11 U.S.C. § 510(c)(1) and (2).
[70] Adv. Doc. 4 and 82, at p. 7, ¶ C.1.(5).

15

also seeks "further subordination" or proportional relief under the *Citicorp* case — a Third Circuit case that permits equitable subordination on facts similar to those here.[71]

In the Tenth Circuit *Alternate Fuels*[72] case, the Tenth Circuit Court of Appeals emphasized that the subordination doctrine examines the behavior of the parties involved and extensively recites the legal principles of equitable subordination under § 510(c):

> The Tenth Circuit requires three conditions for a court to exercise its equitable subordination power: (1) 'inequitable conduct' on the part of the claimant sought to be subordinated; (2) injury to the other creditors of the bankrupt or unfair advantage for the claimant resulting from the claimant's conduct; and (3) consistency with the provisions of the Bankruptcy Code. We place "special emphasis" on whether inequitable conduct has occurred, and recognize three categories of such conduct: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego. A majority of courts have described the degree of inequitable conduct warranting subordination as gross and egregious, tantamount to fraud, misrepresentation, overreaching or spoliation, or involving moral turpitude.

> If a claimant is an "insider" or a "fiduciary" of the debtor, our analysis is less stringent. The party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider.[73]

As the named doctrine implies equitable subordination is one of fairness.

---

[71] Adv. Doc. 82, at p. 10, ¶ D.1.(2). *See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 160 F.3d 982 (3d Cir. 1998).

[72] *Redmond v. Jenkins (In re Alternate Fuels, Inc.),* 789 F.3d 1139, 1154 (10th Cir. 2015). *See also Stoumbos v. Kilimnik,* 988 F.2d 949, 959 (9th Cir. 1993) (whether creditor's claim is secured is irrelevant to inequitable conduct requirement; the inquiry focuses on the conduct of creditor and the creditor's relationship to debtor).

[73] *Alternate Fuels,* 789 F.3d at 1154-55 (internal citations and quotations omitted).

16

If fairness so requires, "[t]he funds in question are still considered outstanding corporate debt," but a court "postpone[s] the subordinated creditor's right to repayment until others' claims have been satisfied."[74]

But equitable subordination is an extraordinary remedy that is applied sparingly.[75]

## 1. Equitable Subordination Based on Conduct of Gordian and the Modells

Under state corporation law, there is no doubt that the individual Modells, as directors of LPAI, were fiduciaries. As such, the Modells had a strict fiduciary duty to act in the best interest of the corporation.[76] If the fairness of a fiduciary transaction is challenged, the fiduciary has the burden of proof (by clear and satisfactory evidence) that the transaction was fair and in good faith.[77] As fiduciaries to LPAI, the Modells had a fiduciary duty to act in the best interest of LPAI creditors. This is a classic case of the Modells impermissibly attempting to serve two masters with conflicting interests, potentially breaching their duty of loyalty.[78]

---

[74] *Id.* at 1154 (quoting *In re Hedged-Investments Assocs. Inc.,* 380 F.3d 1292, 1297 (10th Cir. 2004) (citing *In re Mid-Town Produce Terminal, Inc.,* 599 F.2d 389, 393-94 (10th Cir. 1979))).

[75] *Id.*

[76] *Newton v. Hornblower, Inc.,* 224 Kan. 506, 514-15, 582 P.2d 1136 (1978) (officers and directors occupy a position of trust); *Guth v. Loft, Inc.,* 23 Del. Ch. 255, 270-71, 5 A.2d 503, 510 (1939) (corporate officers and directors stand in a fiduciary relation to the corporation requiring "an undivided and unselfish loyalty" and "utmost good faith"). *See* Adv. Doc. 82, Final Pretrial Order § 6 stipulating to governing law.

[77] *Newton v. Hornblower,* 224 Kan. at 518 (an unfair transaction induced by a fiduciary gives rise to liability for unjust enrichment).

[78] *See In re BMT-NW Acquisition, LLC,* 582 B.R. 846, 862 (Bankr. D. Del. 2018) (breach of fiduciary's duty of loyalty may be shown where fiduciary was on both sides of a transaction). *See also Pepper v. Litton,* 308 U.S. 295, 311 (1939) (discussing the "ancient precept" against serving two masters); *In re Cumberland Farms, Inc.,* 249 B.R. 341, 349 (Bankr. D. Mass. 2000) (directors of a corporation cannot serve two masters whose interests are antagonistic), *aff'd Haseotes v. Cumberland Farms,* 257 B.R. 692 (D. Mass. 2001), *aff'd In re Cumberland Farms, Inc.,* 284 F.3d 216 (1st Cir. 2002).

17

Under bankruptcy law, the Modells are also statutory insiders. Section 101(31)(B)(i) makes a director of a corporate debtor an insider.[79] The definition of an insider also includes a person in control of the debtor.[80] A "person" includes entities such as partnerships and corporations.[81] The uncontroverted facts are sufficient to find that Gordian exercised control of LPAI during 2015 and therefore a statutory insider as well.[82] As noted previously, the presence of insiders implicates the lesser standard of unfair conduct for application of equitable subordination.

Equitable subordination presents a mixed question of fact and law and is generally not well suited for determination on summary judgment.[83] Here the Court is tasked with determining whether the uncontroverted facts, viewed in a light most favorable to the Trustee, are such that the fact finder could reasonably find in favor of the nonmovant on its equitable subordination claim. If so, summary judgment is inappropriate. In determining whether genuine disputes of material fact exist for trial, the Court must refrain from making credibility determinations, weighing the evidence, or deciding competing inferences.[84] Likewise, if different ultimate

---

[79] 11 U.S.C. § 101(31)(B)(i).

[80] 11 U.S.C. § 101(31)(B)(iii).

[81] 11 U.S.C. § 101(41).

[82] *In re BMT-NW Acquisition, LLC,* 582 B.R. at 863 (sole member entity of debtor "plausibly exercised dominion and control over Debtor," making it an "insider" under § 101(31)(B)(iii)).

[83] *In re Alternate Fuels,* 789 F.3d at 1154. *See, e.g., In re Mid-Am. Waste Sys., Inc.,* 274 B.R. 111, 126 (Bankr. D. Del. 2001) (equitable subordination rarely amenable to resolution on summary judgment); *Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.),* 200 B.R. 996, 1016-17 (Bankr. N.D. Ill. 1996) (material questions of fact about whether and to what extent a lender and lender's principal had control over the debtor-borrower); *Campbell v. Taylor (In re French Quarter Group, LLC),* 489 B.R. 400, 402 (Bankr. D. S.C. 2013) (genuine issue of material fact whether claimant engaged in inequitable conduct through its agent and whether agent was acting for the claimant at the time of the inequitable conduct).

[84] *First Sec. Bank of New Mexico, N.A. v. Pan Am. Bank,* 215 F.3d 1147, 1154 (10th Cir. 2000).

18

inferences may be drawn from the uncontroverted facts summary judgment is inappropriate.[85] The credibility of witnesses concerning the details and explanations of key transactions and events looms large in this case.

There is a genuine dispute of material fact whether Gordian and the Modells have engaged in inequitable conduct, including a fiduciary breach, in acquiring the CBT loan facility, and in acquiring the IP while the Modells were directors of both entities. Beginning with Gordian and the Modells filing and prosecuting chapter 11 cases for two entities they apparently did not own but did control, continuing with causing the debtor to ship goods to DR1, then not pay for them, and culminating in their acquiring the IP and the CBT claim, seeking to enforce it as an alternative to their failed effort to acquire ownership of LPAI (via the RALOI stock purchase), there is more than a hint of inequity and unfairness here. That Gordian could acquire a $2.048 million claim for $450,000 five weeks after the claim was acquired by the previous creditor at face value is in itself suspicious and warrants further inquiry and explanation. That the filing, the claim assignment, the IP, the DR1 shipments, and the Modells' exit as directors of LPAI and abandonment of reorganization, all happened in three short months while in bankruptcy and that Gordian/Modell adopted a very aggressive lender posture upon succeeding to ESL's secured position certainly hints at a scheme to acquire the bones of these debtors on the cheap. Buying the ESL note for $450,000 cost Gordian substantially less than completing the purchase of the RALOI stock from the administrator would have.

---

[85] *Security Nat. Bank v. Belleville Livestock Comm'n Co.,* 619 F.2d 840, 847 (10th Cir. 1979).

19

The Trustee claims that Gordian's acquisition of the loan was materially unfair to the debtor because it deprived LPAI of a corporate opportunity—the ability to acquire the CBT debt from ESL at a substantial discount—and salvage its reorganization efforts. Moreover, the above facts, viewed in the best light for the Trustee, show that Gordian and the Modells occupied insider positions, that they controlled the debtor, and that they took advantage of their superior knowledge as Gordian and LPAI directors to secure not only a controlling position with Debtor, but also as Debtor's main creditor. This all but eliminated any possibility of reorganization—the only real way the unsecured creditors could have hoped to be repaid. This places their conduct under scrutiny and warrants further inquiry at trial.

Because the Court agrees with the Trustee that unfair conduct and breach of fiduciary duty by Gordian and Trevor Modell may be found from the uncontroverted facts as laid out in his summary judgment brief, summary judgment on this prong of equitable subordination should be denied.[86] Though it is more of a long-shot, the further subordination/proportional remedy claim should also survive summary judgment for the same reasons.[87] The evidence at trial on equitable subordination may well limit Gordian's recovery to what it paid for the claim, $450,000.[88] If proven,

---

[86] Adv. Doc. 52 at pp. 11-14.

[87] Adv. Doc. 52 at pp. 14-17. *See Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982 (3d Cir. 1998).

[88] *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.),* 211 B.R. 813, 825-26 (W.D. Pa. 1997) (describing the usual remedy for a fiduciary's improper purchase of claims at a discount is to subordinate the claim to the purchase price, thereby eliminating the fiduciary's profits), *aff'd and remanded sub nom. Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 160 F.3d 982 (3d Cir. 1998). *But see LightSquared LP v. SP Special Opportunities (In re LightSquared Inc.),* 511 BR 253, 349-50 (Bankr. S.D.N.Y. 2014) (equitable subordination remedy should

20

this would provide an alternative basis for limiting the allowance of Gordian's claim. But until the Court hears the evidence and determines that equitable subordination is warranted, any potential remedy fashioned by the Court is premature.

### 2. *Equitable Subordination Based on Conduct of ESL and D'Aubigny*

The Trustee also argues that Gordian's claim should be equitably subordinated based upon its predecessor's inequitable conduct (ESL and D'Aubigny).[89] The Court disagrees. It is the *claimant's conduct* and relationship with the debtor that matters for equitable subordination.[90] As the Tenth Circuit stated in *Castletons,* "[t]he critical inquiry is whether there has been inequitable conduct *on the part of the party whose debt is sought to be subordinated."*[91] Neither ESL nor D'Aubigny is the claimant. They are not parties to this proceeding and the Trustee has asserted no equitable subordination claim against them. Their conduct is simply not the focus for determining whether Gordian's claim should be subordinated under § 510(c).

---

remain flexible and should not be linked to the amount paid for the claim by the offending claimant).

[89] Adv. Doc. 82, Final Pretrial Order, at pp. 11-15, § 7.2.

[90] *See Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 700 (5th Cir. 1977) ("The claimant must have engaged in some type of inequitable conduct."); *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 749 (6th Cir. 2001) (stating that equitable subordination analysis evaluates "whether a legitimate creditor engaged in inequitable conduct"); *Sender v. The Bronze Group, Ltd. (In re Hedged-Investments Assocs., Inc.),* 380 F.3d 1292, 1302 (10th Cir. 2004) (to make a prima facie showing of inequitable conduct required for equitable subordination, material evidence of unfair conduct and culpability on *claimant's* part must be demonstrated); *Stoumbos v. Kilimnik,* 988 F.2d 949, 959 (9th Cir. 1993) (stating that subordination inquiry focuses on the conduct of creditor and the creditor's relationship to debtor).

[91] *Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.),* 990 F.2d 551, 559 (10th Cir. 1993) (emphasis added).

21

Nor could any inequitable conduct of ESL or D'Aubigny be imputed to Gordian. If they are not officers, directors, shareholders, agents, or insiders of Gordian, there is no legal basis to impute to Gordian any alleged inequitable conduct attributable to ESL or D'Aubigny. Nor is there any evidence that ESL or D'Aubigny held any ownership interest or exercised control over Gordian. Finally, the uncontroverted facts show no *evidence* of inequitable conduct by ESL or D'Aubigny. All the uncontroverted facts demonstrate is that ESL acquired CBT's loan facility before selling and assigning it to Gordian at a discount. This does not establish unfair conduct, let alone fraud or illegality on the part of ESL or D'Aubigny, that would justify subordination of Gordian's claim. This prong of the Trustee's equitable subordination claim is precisely the type of claim summary judgment was intended to eliminate.[92] Gordian is entitled to summary judgment on this second prong of the Trustee's equitable subordination claim.

### B. Trustee's Claim Objection and Disallowance or Limit of Gordian's Claim, § 502(b)

Standing alone, Gordian's filed claim at $2.048 million would be allowed, but subject to whatever equitable subordination findings I may make at trial.[93] However, the Trustee has objected to Gordian's proof of claim and § 502(b) may provide an

---

[92] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24 (1986) (important function of summary judgment is to eliminate factually unsupported claims).

[93] *See* 11 U.S.C. § 502(a) and Claim 54-1. A rebuttable presumption of the claim's validity and amount arises upon filing. Fed. R. Bankr. P. 3001(f). *See In re Hedged-Investments Associates, Inc.,* 380 F.3d at 1297 (holding that if creditor's claim is equitably subordinated, creditor is still owed an outstanding corporate debt, but court may remedy inequity or unfairness perpetrated by claimant by postponing the right to repayment until other claims have been satisfied).

additional basis for disallowing or limiting the amount of Gordian's claim. Disallowance of a claim may be appropriate under § 502(b) "when the claimant has no rights vis-à-vis the bankrupt, *i.e.,* when there is 'no basis in fact or law' for any recovery from the debtor."[94] As the statute provides, a court shall determine the amount of a claim and shall allow it in such amount "except to the extent" the claim is unenforceable under "applicable law" for a reason other than the claim is contingent or unmatured.[95] Here, the Court must determine whether Gordian's claim should be allowed at $2.048 million as a matter of law based on the uncontroverted facts or whether the summary judgment record demonstrates disputed material facts that necessitate an evidentiary hearing on the amount of Gordian's claim.[96]

The Trustee contends that Gordian's claim "has been paid and/or is subject to setoff."[97] The uncontroverted facts presented here establish that when ESL purchased the loan from CBT, none of the purchase price reduced the amount of LPAI's debt at that time, $2.048 million. There is no evidence in the summary judgment record that LPAI paid down the CBT debt after ESL acquired it. Thus, Gordian purchased a $2.048 million debt from ESL for $450,000. The Trustee has not come forward with any evidence of the amount of Gordian's claim that has been paid.

---

[94] *In re Alternate Fuels, Inc.,* 789 F.3d 1139, 1148 (10th Cir. 2015) (quoting *In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.,* 453 F.3d 225, 232 (4th Cir. 2006)).

[95] 11 U.S.C. § 502(b)(1). "Applicable law" refers to state law. *In re Alternate Fuels,* 789 F.3d at 1147.

[96] *See Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.),* 295 B.R. 140, 145 (10th Cir. BAP 2003) (noting that creditor has the ultimate burden of persuasion as to the validity and amount of the claim, but the objecting party has the burden of going forward with evidence supporting its objection).

[97] Adv. Doc. 82, Final Pretrial Order, at p. 20, § 7.4.A.

23

Likewise, the Trustee has come forward with no contradictory evidence that Gordian's $450,000 purchase of the LPAI debt from ESL was applied to pay down the LPAI debt. To the contrary, the uncontroverted facts are that Gordian's purchase price was applied to the balance of ESL's indebtedness for its purchase of the CBT loan, effectuating CBT's release of ESL and D'Aubigny on the loan sale transaction.

The Trustee also asserts an estoppel argument to limit Gordian's claim. The estoppel is based upon LPAI's (Trevor Modell's) scheduling the CBT/ESL claim in April 2015 as $304,000 and "disputed." This listing is insufficient to establish judicial estoppel against Gordian. Judicial estoppel applies when a party's subsequent position is clearly inconsistent with its former position.[98] Gordian hadn't acquired the CBT claim at the time LPAI (Modell) filed the relevant bankruptcy schedules on April 1, 2015.[99] But more importantly, even if the Court treated Gordian and Modell as one and the same party, the Court has not meaningfully relied on the amount of the scheduled debt to determine the amount of Gordian's claim and there appears to be no factual basis for that being the measure of Gordian's claim on this summary judgment record. Application of judicial estoppel requires that the party to be estopped persuaded a court to accept the party's former position such that a later court's acceptance of an inconsistent position in a subsequent proceeding would create

---

[98] *Eastman v. Union Pacific R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007).
[99] Doc. 67.

24

the perception that one of the courts was misled.[100] The doctrine of judicial estoppel is inapplicable under these facts.[101]

That leaves the common law doctrine of equitable estoppel. Under this theory, the Trustee asserts that Gordian is estopped from asserting the amount of its claim is $2.048 million. But even this estoppel argument is premised on the scheduling of the CBT/ESL debt by LPAI as $304,000 in the bankruptcy filing. As the party asserting equitable estoppel, the Trustee must show that another party, by its acts, or representations induced him to believe certain facts existed and that he rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts.[102] The uncontroverted facts do not readily admit to application of equitable estoppel. Here, two different parties claim different amounts of the debt; the common denominator is Trevor Modell. LPAI, controlled by Modell, represented the amount of the debt owed to CBT/ESL. Later, when Gordian, controlled by Modell, acquired the CBT/ESL debt it asserted the amount of the outstanding debt was over $2 million. The amount of the CBT debt was subsequently confirmed by deposition testimony from its loan officer that the CBT/ESL transaction did not reduce or pay down any portion of the outstanding debt. That testimony has not been controverted. In short, the Court cannot find that

---

[100] *Eastman,* 493 F.3d at 1156.

[101] *Queen v. TA Operating, LLC,* 734 F.3d 1081, 1087 (10th Cir. 2013) (describing purpose of judicial estoppel); *Vehicle Market Research, Inc. v. Mitchell Int'l, Inc.,* 767 F.3d 987, 993 (10th Cir. 2014) (stating that judicial estoppel is inappropriate if impeachment of the party making the inconsistent statement at trial is adequate to protect the integrity of the judicial system).

[102] *Steckline Commc'ns, Inc. v. Journal Broad. Group of Kan., Inc.,* 305 Kan. 761, 769, 388 P.3d 84 (2017).

25

Gordian ever represented the amount of the debt it acquired as $304,000, and even if it had (through Modell), there has been no reliance by any party to its detriment on Debtor's/Modell's scheduling of the CBT/ESL debt. There is also no evidence that any party acted upon the belief that the CBT/ESL claim acquired by Gordian, through Modell, was far less than the $2.048 million now claimed by Gordian. The Trustee has not satisfied his burden of proving equitable estoppel and has not shown the existence of a material factual dispute regarding the amount of Gordian's claim to withstand summary judgment.

Gordian is entitled to summary judgment on the Trustee's objection to its claim under § 502(b) and the theories asserted for disallowance or limiting the amount of Gordian's claim. At the same time, the closely related timing of ESL's—then Gordian's—obtaining the claim, occurring almost simultaneously with Modell's (and Gordian's) exercise of control of these debtors, may ultimately prevent me from concluding that the claim should be paid as filed.[103]

### C. Surcharge of Costs and Expenses, § 506(c)

Gordian contends that the Trustee's professional fees and expenses for preparation of the 2015 estate tax return and other administrative duties were not incurred to preserve or dispose of Gordian's collateral and thereby did not benefit Gordian as required by § 506(c). Generally, estate administrative expenses are paid from unencumbered estate assets as priority claims, while expenses incurred to preserve or dispose of a secured creditor's collateral and which benefit that creditor

---

[103] See pp. 20-21, supra.

may be surcharged against its collateral.[104] It is typical in chapter 11 cases for a secured creditor to consent to a "carve-out" from its cash collateral to pay such administrative expenses.

At the first-day motions hearing on March 20, 2015, LPAI's motion to use cash collateral[105] was granted on an interim basis.[106] LPAI was permitted to use ESL's cash collateral and ESL was granted a superpriority administrative expense claim subject only to the "Carve Out Costs" for professionals and fees during the Interim Period up to $35,000.[107] A second interim cash collateral order was entered on April 10, 2015, extending use of cash collateral through May 12, 2015.[108] The Carve Out provision in the second interim order increased the professional fees to "$75,000 for the period coverd [sic] by this Order." This Order remained in "full force and effect, and shall survive entry of any such other order, including, without limitation any order . . . converting these cases to any other chapter under the Bankruptcy Code . . . ."[109] A Creditor's Committee was appointed on April 13 and the Committee filed an objection to the cash collateral motion and certain provisions in the interim orders, not pertinent for our purposes here.[110] A status conference was held on May 12, 2015,

---

[104] *Cf.* 11 U.S.C. § 507(a)(2) and § 503(b) with 11 U.S.C. § 506(c).
[105] *See* No. 15-10502, Doc. 12 and ESL's response, Doc. 33.
[106] No. 15-10502, Doc. 36 and Doc. 45 (First Interim Cash Collateral Order for the period ending April 9, 2015).
[107] Doc. 45, pp. 8-10, ¶¶ 18-19. "Interim Period" is defined in the Order as commencing on the date of the petition through the date of any hearing on any final order. Doc. 45, at ¶ 14. *See Costa v. Robotic Vision Sys., Inc. (In re Robotic Vision Sys., Inc.),* 367 B.R. 232, 237-39 (1st Cir. BAP 2007) (describing "carve-out agreement" and judicial estoppel of secured creditor to object to payment of professional fees from carve-out).
[108] Doc. 79 (Second Interim Cash Collateral Order for the period ending May 12) [also designated Ex. HH in summary judgment record).
[109] Doc 79, ¶ 20.
[110] Doc. 128.

27

at which time the Court extended the interim cash collateral order to May 28, 2015, but preserved the objections raised by the Committee.[111] The Carve-Out provision and binding effect of the third interim cash collateral hearing remained the same as the second interim order.[112] On May 28, 2015 the Court authorized LPAI's continued use of cash collateral for an additional 60-days and set the motion over to a July 16 status conference.[113] No further cash collateral order, interim or final, was ever submitted to the Court memorializing the May 28 hearing and two weeks later the Committee moved to appoint a chapter 11 trustee. LPAI's right to use cash collateral would have expired, at the latest, in late July of 2015 upon expiration of the 60-day extension orally approved by the Court on May 28. Nothing in the carve-out provision of the cash collateral order specifically addresses professional fees and expenses for preparation of an estate tax return, though these strike me as typical estate administrative expenses.

Here, the Trustee seeks to surcharge Gordian's collateral for his tax preparation costs. Because the tax preparation costs arise from the sale of Gordian's collateral (generating income), a sale to which it impliedly consented, the Trustee contends those costs should be assessed against the sale proceeds as costs directly arising from the sale. Gordian contends that these costs were not incurred to preserve or dispose of its collateral as § 506(c) requires them to be assessed against the sale

---

[111] Doc. 134 and 147 (Third Interim Cash Collateral Order for the period ending May 28, 2015) [also designated Ex. NN in summary judgment record]. This cash collateral order is erroneously titled the "Second Interim Order Authorizing Use of Cash Collateral . . ."
[112] Doc. 147, ¶ 5.
[113] Doc. 151.

28

proceeds, but are "only for use of the general estate" and should not be allowed.[114] This claim only matters if the Trustee fails to prove his equitable subordination claims and Gordian retains its lien in the sale proceeds.

Nothing in the summary judgment record tells the Court what fees were incurred in preparing the 2015 estate tax returns or whether carve-out funds remain to pay that expense. Thus, both the § 506(c) claim and summary judgment motion are premature until the Court adjudicates the equitable subordination claim. The summary judgment record is not sufficiently developed to evaluate the cost claim under § 506(c) as a matter of law. Summary judgment is therefore denied.

III.     Gordian's Motion to Strike Summary Judgment Declarations

Gordian moves to strike the declarations of the Trustee and Matthew McClintock[115] submitted in support of the Trustee's opposition to summary judgment.[116] The Court observes that neither declaration is particularly helpful and has disregarded them in preparing this summary judgment ruling. Accordingly, Gordian's Motion to Strike is DENIED as moot. The Court reserves ruling on whether Mr. McClintock will be permitted to testify at trial in the Trustee's case-in-chief as a previously undisclosed witness.

Conclusion

Gordian's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is DENIED on the Trustee's equitable subordination

---

[114] Doc. 45, p. 41, § F.
[115] Adv. Doc. 50, pp. 10-15. McClintock was former counsel to the Creditors Committee.
[116] Adv. Doc. 57.

29

claim (including the further subordination claim) based upon the alleged inequitable conduct or breach of fiduciary duty of Gordian and the Modells. Summary judgment is GRANTED on the Trustee's equitable subordination claim based upon the alleged misconduct of ESL and D'Aubigny. Summary judgment is GRANTED on the Trustee's objection to Gordian claim 54-1, thereby allowing Gordian's claim in the amount of $2,048,022.57 as filed, but subject to the Court's determination of the surviving equitable subordination claim and remedy. Summary judgment is DENIED on the Trustee's claim for costs and expenses.

Gordian's request for sanctions against the Trustee and his counsel under 28 U.S.C. § 1927 is DENIED.[117]

The Court will convene a status conference on **October 18 at 1:30 p.m. CDT,** to discuss trial on the Trustee's surviving claims against Gordian noted above, as well as the Trustee's counts against Trevor Modell and Devon Modell. The parties should have their calendars available as the Court intends to set this matter for trial before year's end. Counsel who will be trying the case are required to appear for the status conference.

Upon entry of this Order, the Clerk of the Bankruptcy Court shall send via e-mail a file-marked copy of the Order to Trevor Modell and Devon Modell at the e-mail addresses they have provided to the Court. The Modells will be permitted to appear by telephone for the status conference.

# # #

---

[117] Adv. Doc. 45, pp. 41-43.